RATCHFORD [FABE, SUCCESSOR], SUPERINTENDENT OF INSURANCE, APPELLEE, *v.* PROPRIETORS' INSURANCE COMPANY; PIOLATA, APPELLANT.

[Cite as Ratchford *v.* Proprietors' Ins. Co. (1989), 47 Ohio St. 3d 1.]

(No. 88-452—Submitted March 28, 1989—Decided November 15, 1989.)

*Anthony J. Celebrezze, Jr.,* attorney general, *Emens, Hurd, Kegler & Ritter, William J. Brown, John P. Brody* and *Richard W. Schuermann,* for appellee.

*Crabbe, Brown, Jones, Potts & Schmidt* and *John P. Kennedy,* for appellant.

DOUGLAS, J. Former R.C. 3903.07, as recodified October 1, 1953, provided in relevant part:

"The superintendent may, *subject to the approval of the court* sell or otherwise dispose of the real and personal property of the company, or any part thereof, and sell or compromise all doubtful or uncollectible debts or claims owing to the company, includ-

ing claims based upon an assessment levied against a member or subscriber of any company issuing assessable policies." (Emphasis added.)

The merit issue before us involves the operative words "subject to the approval of the court." Do these words give a trial judge the right to disapprove an otherwise validly secured and entered-into purchase contract or is the trial judge limited to determining if the procedures leading to the agreement were in accordance with law and free from fraud or abuse of the liquidator's discretion? Because we believe that the intent of the General Assembly, as expressed in R.C. Chapter 3903, was to give a liquidator broad general authority and responsibility to dispose of assets of an insolvent insurance company subject only to judicial review to assure that there is no fraud or abuse of discretion in the process, we reverse the judgment of the court of appeals and enter final judgment for appellant.

Before proceeding to the merit issue, there are two procedural matters that should be addressed. On either ground (or both), the judgment of the court of appeals should be reversed and final judgment entered for appellant.

There really is no case or controversy now pending before this court nor would there be before the trial court if this case is either affirmed or reversed. Certainly the liquidator, who sought appellant's bid, approved the bid, signed a contract accepting the offer and then urged the trial court to approve the contract, should not now be heard to say that he disavows the contract. Since he (the liquidator) and appellant are the only parties now before us (Capitol having withdrawn), it would seem that the contract between these parties should be approved since there are no recognizable

pending objections to the contract. Of course we do not decide the case on this ground since the matter has not been presented to us, briefed or argued.

The second procedural issue involves the basis for the court of appeals' decision. The court of appeals found "* * * an irregularity in the sale process which entitled the court [trial court] to reject the liquidator's motion to approve the contract with Piolata. * * *" The perceived "irregularity" was that the Sabatino offer, which had originally been accepted by the trial court and then orally vacated by that court, had not been vacated as a matter of public record. The court of appeals reasoned that "* * * since the property was not publicly advertised for sale, *some* bidders *may* have concluded that the property was no longer subject to sale. * * *" (Emphasis added.) The court of appeals found that this "irregularity" was enough to permit the trial court not to approve the contract between the liquidator and appellant.

There are two serious problems with this conclusion of the court of appeals. First, as the court of appeals itself noted, "R.C. 3903.07 gives the superintendent the authority to sell or otherwise dispose of the real property of a liquidated company. It is within the discretion of the superintendent *to determine the means of sale* and to determine what bidder has submitted the offer that is in the best interest of the creditors. *There is nothing in R.C. Chapter 3903 which prohibits the use of a private sale in the liquidator's disposition of a specific piece of real property.*" (Emphasis added.)

Given this clear and unequivocal statement, it is difficult to understand the final conclusion of the court of appeals that the property "* * * was not publicly advertised for sale * * *" and

4

that this was an "irregularity" in the proceedings which supported the negating of the contract between the liquidator and appellant.

The second problem with the court of appeals' opinion and decision is one of even more profound concern. Appellate courts review cases based upon records compiled in lower courts and upon issues raised in trial courts. Here, the court of appeals raised, and then decided, the case on the issue of whether the property was publicly advertised for sale. Such an issue was never raised, argued or briefed in the trial court and, in addition, there is *nothing* in the record to support the appellate court's conclusion. It is unfair on appeal, and inappropriate, to decide a case on an issue that a party, losing by the decision, has not had an opportunity to refute by introducing evidence or argument.

In addition, what evidence there is in the record is completely contrary to the court of appeals' conclusion. It is alleged, and not denied, that a very large "For Sale" sign had been erected on the property and had remained in place for some time. The property and sign were in place on one of Central Ohio's busiest roadways. It is difficult to understand the court of appeals' decision that *some* bidders *may* have concluded that the property was no longer for sale during this protracted process.

Further, the liquidator actively solicited bids for the property between the time the trial judge orally vacated his original approval of the Sabatino offer, October 17, 1986, and the time the contract with appellant was concluded, February 1987. Certainly the vacation of the Sabatino offer was no secret to the many potentially interested bidders who appeared at the several court hearings held subsequent to the vacation. Additionally, the record *does* contain documents from other developers and real estate agencies, leaving no question that those interested in the property had knowledge that the property was for sale and the liquidator was seeking offers.

While the foregoing is persuasive, the real point here is that the court of appeals decided this case on an issue that was not raised by any party, creditor, intervenor or the trial court itself! Adopting such a procedure was improper and unfair.

As to the merit issue, we agree with the court of appeals when, in discussing the appellant's accepted offer, it made, in part, the following points: that the superintendent, pursuant to R.C. 3903.07, has the authority to sell a liquidated company's real property; that the superintendent has the right and power to determine the means of sale; that nothing prohibits a private sale; that the superintendent has the authority to determine what is in the best interest of the creditors; that in accepting appellant's offer, the liquidator said he had reviewed various offers for the sale of the property and had chosen appellant's; that the liquidator had accepted appellant's offer because he believed it was the best and highest bid; and that "* * * [t]here is no evidence that Piolata's bid was made fraudulently or irregularly * * *."

While, admittedly, precedent on the issue now before us is sparse, we find *In re Liquidation of National Surety Co.* (1936), 248 App. Div. 111, 288 N.Y. Supp. 1014, helpful and persuasive. This case involved a strikingly similar fact pattern to the case at bar. At issue was the interpretation of Section 421 of the New York Insurance Law (rehabilitation statute). In almost identical language to R.C. 3907.07, New York's Section 421 stated:

"The Superintendent may, *subject*

*to the approval of the court* (a) sell or otherwise dispose of the real and personal property, or any part thereof, of [the company in liquidation]. * * *" (Emphasis added.)

In *National Surety Co.,* and as found by the court of appeals below in the case at bar, "* * * the liquidator accepted a bid which was the highest bid received by him after the property was offered for bid. The trial court refused to accept that bid because the third highest bidder had improved its bid by amendment in open court to provide more money for the creditors. There was no claim that the original bid chosen by the liquidator was made fraudulently or irregularly. The superintendent of insurance was motivated by the best interest of the creditors of the insurance company in accepting that bid. *The appellate court reversed the judgment of the trial court on the basis that the court's power of approval extended only to the examination of whether the bid which the liquidator had accepted was made fraudulently or irregularly* and whether the superintendent of insurance was motivated by the best interest of the company's creditors. The appellate court pointed out that all interested parties had a fair chance to compete and the bid approved by the liquidator was the highest and best bid *at the time the liquidator* accepted it." (Emphasis added.)

Given this recitation by the court of appeals and these facts, which are almost identical to the case at bar, we further concur with the court of appeals' statement that "[w]e agree with the majority in *In re National Surety Co.* The liquidator's bidding process would be meaningless if the court can consider a higher bid which was not submitted to the liquidator in a sale process which took place fairly and without irregularity."

Our only disagreement with the court of appeals is its finding that an "irregularity" involving the Sabatino bid existed and thus the property should have been publicly advertised. We find no irregularity at all, given the facts that the sale could have been a private sale and that all the parties who eventually expressed an interest submitted offers. As the court in *National Surety Co., supra,* at 117, 288 N.Y. Supp. at 1021, said:

"* * * Nevertheless, we do not believe that the discretion of the superintendent of insurance should be interfered with upon the theory that sometime in the future the property of the corporation may become more valuable than it was on March ninth when the bids were opened. * * * The public at large were accorded a full and fair opportunity to comply with the provisions of the proposal * * *. Public confidence requires that an officer who has charge of the sale of large properties, should be permitted to accept the honest and adequate offer of the highest bidder where, as here, all investors had a fair chance to compete." This is *exactly* what happened in this case!

It is argued, however (and now *only* by the liquidator who *accepted* appellant's offer and moved the trial court to approve the agreement), that even though there was no fraud, irregularity or abuse of discretion in the selling and buying process and even though the liquidator obtained the highest and best price for the property, based upon negotiations and bids, that was available at the time of the proposed sale, the trial court was only interested in obtaining the most money possible for the creditors of PIC in the liquidation. Therefore, the argument continues, the trial court had the authority to disapprove the contract between the liquidator and appellant

based on the "subject to approval of the court" language in R.C. 3903.07.

Other than this is a curious argument made by a person, the liquidator, who has signed a contract and previously asked the trial court to approve the offer as being the highest and best obtainable, and no fraud or irregularity has occurred, the argument fails for at least six other reasons.

First, the statutory scheme for liquidation of insolvent insurance companies needs to be understood. Pursuant to then existing R.C. 3903.07, the liquidator becomes the owner in law — the legal owner — of all the property of the insolvent corporation. That means that title to the property, including the land in question, is vested in the liquidator. It is obvious that the General Assembly, in giving legal ownership to the liquidator and then empowering the liquidator to negotiate and execute binding contracts of sale, did not intend to vest in a trial court the power to set aside such contracts on the basis of inadequate price, terms and conditions of sale or other matters, absent, of course, fraud or abuse of discretion by the liquidator. To permit a trial court to do so would result in the court being able to substitute its judgment for that of the liquidator. It is not difficult to see what a cumbersome procedure this would be and that the intent of the General Assembly was to limit a court's inquiry to a determination that no fraud or abuse of discretion has occurred.

Second, this interpretation of legislative intent is clearly supported by subsequent actions of the General Assembly. When the legislature amended, in 1983, the statutory scheme for liquidation of insolvent insurance companies, court approval of sales of land was eliminated entirely without so much as a reported comment in the legislative history. In making minor changes and "tuning up" the law, it can be cogently argued that the General Assembly, not commenting upon the change, never intended at any time to give a trial court a participant's role in liquidation, but intended only a supervisory role to ensure against fraud and abuse of discretion.

Third, and as further proof of this intent, we need to look further into the liquidation statute. Then in effect, R.C. 3903.11, relating to liquidation procedure, provided that in liquidating the insolvent company's business, the liquidator could solicit a contract with another *solvent* insurance company to assume the liability, in whole or in part, of policyholders of the insolvent company. If the liquidator chose to proceed pursuant to R.C. 3903.11, then the trial court was given an active role. There had to be a hearing and before court approval was obtained, the court was required to find that the liquidator had obtained the best possible contract and that the contract was in the best interests of the parties. Only then could the court approve the contract. Significantly, no mention of the sale of the insurance company's property was made in R.C. 3903.11 and, thus, this more detailed legislatively mandated procedure of court intervention did not apply to sales of real property such as we now have before us.

Fourth, it is instructive to look at how the General Assembly and the courts handle other types of liquidations. While again authority is sparse, it is important to recognize that current R.C. Chapter 1157 involves savings and loan associations which appear to be distressed or insolvent. In that chapter, and specifically R.C. 1157.10(B), it is provided that the superintendent of building and loan associations "* * * may sell, lease, exchange, or otherwise dispose of any

assets of such association, whether real, personal, or mixed * * * and accept therefor such considerations as such court or judge by order approves * * *." The predecessor to R.C. Chapter 1157 was G.C. Chapter 687. In interpreting several provisions of G.C. Chapter 687, the Second District Court of Appeals in *State, ex rel. McDonald, v. Kroeger* (App. 1938), 27 Ohio Law Abs. 329, 331, said:

"The Legislature is within its right when it invests exclusive control and supervision of associations in the superintendent of Building & Loan Associations.

"Of course, the law is well recognized that the acts of any administrative officer or individual *may be questioned for fraud or abuse of discretion.*" (Emphasis added.)

The court of appeals continued:

"An examination of the Eichenbary Act *and other cogent sections* will disclose that the Legislature sought to circumvent a possible *abuse of discretion* by providing that many of the orders of the superintendent would become effective only upon approval by the Court of Common Pleas in and for the county in which the Building & Loan Association was located.

"Under the provisions of the Eichenbary Act *great latitude* is given to the superintendent in the administration of the affairs of a Building & Loan Association taken over or being liquidated under his supervision. * * *" (Emphasis added.) *Id.*

Therefore, when faced with reviewing language similar to "subject to the approval of the court" language as found in R.C. 3903.07, the standard used was abuse of discretion. Likewise, here, there should be no substituting of a court's judgment for that of the liquidator absent fraud or abuse of discretion.

Fifth, it is fair to ask where, if our decision were otherwise, would the process end — or would it ever end? If the property was now to be advertised and new bids sought, what is there to stop yet another person or entity from coming into court, after the liquidator has received the offers and accepted the highest bid, and indicating that the advertisement for bids had not been noticed and the non-bidder was now willing to pay $500 or $1,000 more per acre. Upon what authority could a trial court now say "no, the process is over"? Obviously, the same rationale in refusing appellant's accepted offer would pertain to new offers or bids.

Here the property in question is apparently appreciating in value. What if property being liquidated was losing value and the offeror of a liquidator-accepted offer chose to be relieved of his or her obligations? All the offeror need do is have someone come into court and offer something more for the property, thereby forcing new bids or offers at which the original offeror and the new offeror need not bid. Such a policy, as espoused by the trial court and the court of appeals, could lead to a complete frustration of the sensible scheme laid out by the General Assembly. Appellant is now obligated. Barring fraud or abuse of discretion, both appellant and the liquidator must live with their bargain.

The sixth and final concern is really the greatest. Here we have a mutually bargained-for, agreed-to contract. The liquidator here is not like a court-appointed receiver or trustee. The liquidator is not acting at the behest or on the behalf of the court. The liquidator is the *owner* of the property. He has entered into an agreement to sell what amounts to his property. The contract is binding and absent fraud, abuse of discretion or illegality, it must be enforced. Certainly, if the appellant-offeror were seeking to be relieved

from his bargain, this court and each court along the way would say to appellant that he has made a bargain, and that good or bad he must live with it. The liquidator's obligations should not be any different.

Generally speaking, a contract is a definite agreement between two or more competent parties based upon a legal consideration to do, or to refrain from doing, some lawful thing. The contract in question between appellant and the liquidator meets each of these requirements. The understanding between the parties was definite. Each of the parties was competent and appellant made a deposit and promised to pay the balance due. The agreement was to buy and sell a piece of property — clearly a lawful undertaking.

As England moved from a relatively primitive culture to a commercial center with a capitalistic trend, the law, by necessity, also changed. One of the changes involved "freedom of contract" and this freedom became the underlying principle for the development of the law of contract.

This is well-illustrated in Maine's classic phrase that "* * * the movement of the progressive societies has hitherto been a movement from *Status to Contract.*" (Emphasis *sic.*) Maine, Ancient Law (4 Amer. Ed. 1906) 165. Professor Williston added that "[e]conomic writers adopted the same line of thought. Adam Smith, Ricardo, Bentham and John Stuart Mill successively insisted on freedom of bargaining as the fundamental and indispensable requisite of progress * * *." Williston, Freedom of Contract (1921), 6 Cornell L.Q. 365, 366.

Chief Justice John Marshall said about the law of contract: "* * * If, on tracing the right to contract, and the obligations created by contract, to their source, we find them to exist anterior to, and independent of socie-ty, we may reasonably conclude that those original and pre-existing principles are, like many other natural rights, brought with man into society; and, although they may be controlled, are not given by human legislation." *Ogden* v. *Saunders* (1827), 25 U.S. (12 Wheat.) 213, 345.

The right and freedom to contract is an inalienable right which existed prior to, and independent of, government. The power of the parties to contract as they please for lawful purposes remains a basic principle of our legal system. We are not persuaded to inhibit that right in this case.

Accordingly, in a statutory liquidation of an insolvent insurance company, former R.C. 3903.07 authorizes a court of common pleas to withhold approval of the sale, by the statutory liquidator, of real property of the insolvent company only where there is a finding of fraud or abuse of discretion on the part of the liquidator.

The judgment of the court of appeals is reversed. The liquidator is ordered to carry out the terms of appellant's accepted offer. Final judgment is granted to appellant.

*Judgment reversed.*

SWEENEY, WRIGHT and RESNICK, JJ., concur.

MOYER, C.J., HOLMES and H. BROWN, JJ., dissent.

HOLMES, J., dissenting. Former R.C. 3903.07 essentially grants the court of common pleas the right of first refusal of all contracts entered into by the statutory liquidator to sell or otherwise dispose of the property of an insolvent insurance company. The statute unambiguously makes such contracts "subject to the approval of the court." This "approval" is not in the

nature of judicial review of the actions of an administrative officer, whereby great deference is granted to the liquidator's decisions and reviewed solely on the standards of abuse of discretion and fraud. Rather, the court's "approval" function is in the nature of broad oversight, whereby the court exercises its own discretion in reviewing the deal struck by the liquidator. The court may not, of course, substitute its judgment for that of the liquidator. In other words, the court may *reject* the liquidator's proposals with respect to one bidder, but it may not *direct* the liquidator to grant the contract to another bidder.

The conclusions of the majority to the contrary are not supported by the language of former R.C. 3903.07, or the purpose of the liquidation process. The majority curiously indicates that there is no case or controversy pending before us. Were this holding accurate, on an issue not raised by any party before this court or the lower court, that would be the end of the matter.

The holding is, of course, not accurate, and results from a misconstruction of the role of the liquidator and the facts of this case. The liquidator entered into a contract with appellant and submitted it for the required court approval at a time when he believed appellant's to be the highest and best offer. Immediately prior to the hearing on the contract, two other bidders submitted offers which were $1,000 and $1,100 per acre more than appellant's offer. The statutory liquidator's goal is not to unload the insolvent insurer's property at the first opportunity, but rather to protect the policyholders, stockholders and creditors of the insolvent insurer, as well as the public in general. See former R.C. 3903.03. The court, in turn, is directed to oversee the liquidator in meeting these responsibilities. In this case, the court recognized the adverse interests which arose between the liquidator and appellant when higher bids were received. The controversy in this case is clear: the liquidator seeks to have this court recognize the statutory authority of the court of common pleas to allow the liquidator to reopen negotiations and accept the highest and best offer for the insolvent insurer's property; and appellant seeks to bind the liquidator to his acceptance of appellant's bid, absent fraud or an abuse of discretion. The majority apparently concedes as much, as it proceeds to decide such controversy on the merits.

The majority's decision is grounded upon incantations of sanctity of contract. However, freedom of contract has not been assailed by the trial court's decision, pursuant to former R.C. 3903.07, as there was no binding contract presented to it. Nor could there be, since the trial court is the final step in the contracting process between the parties: its approval is a *pre-condition* to a binding contract. Although the liquidator is the titleholder of all property of the insolvent insurer, the liquidator's power of sale is not absolute. The proposed contract, when signed by the parties and submitted to the court, is not an enforceable agreement. Prior to *any* hearing on such a contract approval, various events and discoveries may occur: additional, more attractive bids may be submitted; the proposed buyer may become insolvent or otherwise unable to perform; irregularities or unfairness in the bidding or contracting process may be discovered, to name a few. Approval of a proposed contract in the face of these and other like occurrences, as today's decision mandates, is an abdication of the court's responsibilities as an overseer of the liquidation of the insolvent insurer's assets.

Even worse, it unnecessarily renders the statutory liquidator helpless to protect the interests of the insurer's policyholders, creditors, members, and stockholders, and the public in general.

Finally, I believe the majority has misinterpreted the law of New York on this subject. New York courts have developed a substantial, coherent and persuasive body of case law concerning the scope of a court's authority in approving sales of property by a statutory liquidator, pursuant to a statute nearly identical to former R.C. 3903.07: *i.e.,* Section 421 of the New York Insurance Law. In *In re Casualty Co. of America* (1927), 244 N.Y. 443, 155 N.E. 735, New York's highest court, per Chief Judge Cardozo, explained the general authority of the liquidator in relationship to the court:

"The statute is notice to him [the liquidator], however, and to any one who deals with him, that the agreement, whatever its form, is of merely provisional validity. He may fix the rate of compensation as a trustee or an assignee for creditors or a receiver may be said to fix it (cf. L. 1903, ch. 336, § 9), but subject at all times to the approval of the court. The meaning is that even when he acts, the court shall have a veto. * * *

"* * *

"Argument is made that what the liquidator does in fixing the value of a service, if not exempt altogether from review by the courts, must be held to be exempt unless power and discretion have been flagrantly abused. When he is merely wrong, the court is helpless, but when he is very wrong indeed, its authority is restored. There can be no basis for this distinction unless it be in the assumption that the Superinten-

dent is an arbitrator whose award is not impeachable for error in the determination of the merits, but impeachable only for mistake appearing upon the face thereof, or for fraud, or abdication of duty equivalent to fraud (*Fudickar* v. *Guardian M. L. Ins. Co.,* 62 N.Y. 392; *Sweet* v. *Morrison,* 116 N.Y. 19, 33; *Matter of Burke,* 191 N.Y. 437, 440; *Davis* v. *Henry,* 121 Mass. 150, 154; 3 Williston, Contracts, § 1929-a). But an arbitrator he is not, as we have already sought to show. Neither expressly nor by reasonable implication are those who deal with him advised that in the act of so dealing they have clothed him with judicial power * * *." *Id.* at 449-450, 155 N.E. at 736-737.

This holding, that the phrase "subject to the approval of the court" means that the court may veto an action of the liquidator but cannot compel it, was reaffirmed in *In re Lawyers Mortgage Co.* (1944), 293 N.Y. 159, 162, 56 N.E. 2d 305, within the specific context of the liquidator's power to sell property of a delinquent insurer. See, also, *Natl. Bondholders Corp.* v. *Joyce* (1937), 276 N.Y. 92, 96, 11 N.E. 2d 552, 553.

The majority's citation to *In re Liquidation of National Surety Co.* (1936), 248 App. Div. 111, 288 N.Y. Supp. 1014, misses the point of that case. All five justices of the *intermediate* appellate court in *National Surety Co.* agreed on the scope of the trial court's authority as announced in *In re Casualty Co. of America, supra: i.e.,* that the court was to exercise its discretion in approving or disapproving the liquidator's proposal, but could not substitute its judgment and order the acceptance of a higher bid.[2] All five

---

[2] Justice Glennon, speaking for a three-judge majority, thus characterized the lower court's order: "The order as entered *not only* provided for the rejection of * * *

[the] bid, but, in addition thereto, contained an authorization, but not a direction, to the Superintendent of Insurance to sell seventy percent of the stock to the Bancamerica-

agreed that the lower court erred in ordering acceptance of the later, higher bid. The court split on the issue of whether the lower court erred in rejecting (or rather, ignoring) the original bid submitted by the liquidator. See fn. 2, *supra.* The three sentences of the majority opinion in *National Surety Co.* which are relied upon by the majority here are merely an analysis of the lower court's exercise of its own discretion.

The dissenting opinion in *National Surety Co., supra,* provided a different view of the lower court's discretion in light of the facts and circumstances before it:

"Substantially seventy-six percent of the creditors, therefore, appeared to oppose the acceptance of the bid and only one single creditor appears to have favored it. It also is to be noted that the committee representing stockholders objected. Moreover, the testimony of the experts called on behalf of the objectants gave an average value of some $13,000,000 to the stock. Their testimony was also to the effect that a three-years' experi-

ence, or until the end of 1936, would afford a better basis for ascertaining the real value. The record shows that the status of the liquidation proceedings is such at this time as would not result in a present distribution to creditors and that a postponement of any sale would involve no practical risk. It appears, therefore, as contended for by the creditors and the owners (stockholders), the bid of the appellant was not adequate and should be rejected under all the circumstances." *Id.* at 119, 288 N.Y. Supp. 1022-1023.

The appellate court in *National Surety Co., supra,* was merely reviewing the exercise of the *lower court's* discretion in exercising its statutory veto power over sale contracts submitted by the liquidator. The case is thus consistent with the standard set forth in *In re Casualty Co. of America, supra,* by Judge Cardozo. It certainly does not support the restrictive standard adopted by the majority here. Quite simply, the trial court, in its sound discretion, may veto, but may not compel, the actions of the liquidator.

---

Blair Corporation for $101.50 per share." (Emphasis added.) *National Surety Co., supra,* at 112, 288 N.Y. Supp. at 1016. The majority later disapproved this order on *two* bases (and without the support of *any* legal citation). First, commenting on the order to award the bid to the subsequent higher bidder (Bancamerica-Blair Corp.), the court stated: "Instead of either approving or disapproving the acceptance of the bid of the appellant, the court entered the order now under review. We fail to find anything in section 421 of the Insurance Law which gave the court the right to make and enter this unusual order. The result of what the court has done was to substitute its judgment for that of the Superintendent. Such a procedure was not even contemplated by the Legislature in enacting this particular statute." *Id.* at 116-117, 288 N.Y. Supp. at 1020.

Second, the court examined, as the trial court should have, whether or not the liquidator was justified in recommending the approval of the original bid. The majority believed that he was, and held that the bid should have been approved. *Id.* at 117, 288 N.Y. Supp. at 1021.

The two dissenting justices, after citing the controlling law of *In re Casualty Co. of America, supra,* agreed that the lower court went too far in ordering approval of the subsequent higher bid. However, the dissenters felt that the "best interests of the creditors and stockholders and of the corporation itself were served by the rejection of the * * * [original] bid." *National Surety Co., supra,* at 119, 288 N.Y. Supp. at 1023 (O'Malley, J., dissenting). Thus, these two justices dissented only "from so much of the majority opinion as directs the acceptance of the * * * [original] bid." *Id.*

Such a mere veto, or disapproval, of the proposed contract is precisely what occurred in this case. At the time of the approval hearing, the court was faced: (1) with new offers for purchase of this substantial asset, which were much larger than appellant's, and which would be in the best interests of the policyholders and creditors if available for approval; (2) with the irregularity of the prior proceeding resulting from the failure at that time to journalize the vacation of the order approving the original Sabatino order; and (3) with the irregularity and confusion resulting from the alleged varying contract terms of the Sabatino offer. In light of these factors, which worked to undermine the integrity of the liquidation process, the court properly exercised its discretion and disapproved the Piolata bid. Then, rather than substitute its judgment for the judgment of the liquidator and decide which of the several contracts to approve, the court ordered the liquidator to conduct a public sale, which would place all parties on equal footing.

Because it is my opinion that this veto of the proposed sale was clearly within the authority of the court in its capacity as supervisor of the liquidation process, granted by former R.C. 3903.07, I must respectfully dissent.

MOYER, C.J., and H. BROWN, J., concur in the foregoing dissenting opinion.