**MORTGAGE NETWORK, INC., Appellant,**

v.

**AMERIBANC MORTGAGE LENDING, L.L.C. et al., Appellees.**

[Cite as *Mtge. Network, Inc. v. Ameribanc Mtge. Lending,
L.L.C.*, 177 Ohio App.3d 733, 2008-Ohio-4112.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 08AP–70.

Decided Aug. 14, 2008.

Wiles, Boyle, Burkholder & Bringardner Co., L.P.A., Michael L. Close, Jay B. Eggspuehler, and Lauren S. Brill, for appellant.

Squire, Sanders & Dempsey, L.L.P., Jill S. Kirila, Scott C. Walker, and Aneca E. Lasley, for appellee Ohio Bar Title Insurance Co.

---

TYACK, Judge.

{¶ 1} Mortgage Network, Inc. is appealing from the granting of summary judgment on behalf of Ohio Bar Title Insurance Co. on a breach-of-contract claim. The assignment of error before us reads:

I.  The Trial Court erred when it granted summary judgment in favor of Ohio Bar Title as to Mortgage Network's breach of contract claim.

{¶ 2} In July 2000, Mortgage Network entered into a contract with Ameribanc Mortgage Lending, L.L.C., to purchase bundles of loans secured by first mortgages. In conjunction with this contract, Ohio Bar Title issued a closing protection letter in which Ohio Bar Title agreed to reimburse Mortgage Network for any actual losses incurred in connection with any closings conducted by Buckeye Land Title Agency, Inc., then an agent of Ohio Bar Title.

{¶ 3} Buckeye Land Title stopped being an agent for Ohio Bar Title less than one year later in June 2001. Buckeye Land Title and its owners defrauded several people and entities by failing to forward title insurance premiums, failing to pay off prior mortgages when refinancing occurred, and otherwise defrauding consumers and businesses. This lawsuit was filed by Mortgage Network as a result of the frauds of Buckeye Land Title, Brenda J. Davis, and her husband, Michael A. Davis. Brenda Davis was the sole stockholder in Buckeye Land Title during part of the pertinent time, but apparently, Michael Davis orchestrated the fraud and eventually took all ownership of Buckeye Land Title's stock.

{¶ 4} Mortgage Network argued in the trial court that the contractual relationship it had with Ohio Bar Title lasted not only from July 2000 to June 2001, but beyond. Mortgage Network argued that it was never informed by Ohio Bar Title

that its agency relationship with Buckeye Land Title had ended, so the guarantees in the closing protection letter continued to be in force, especially the guarantee to reimburse Mortgage Network for any losses incurred.

{¶ 5} In response, Ohio Bar Title alleged that no valid title commitments were issued by it for closings that occurred after the relationship with Buckeye Land Title ended. Michael Davis kept issuing schedules A and B, which are generally attached to a jacket from Ohio Bar Title, and the two schedules plus the jacket constituted a valid policy. As to some 41 loans funded in 2003, Mortgage Network never received complete policies, and Ohio Bar Title never received any premiums to pay for such policies. Ameribanc Mortgage, run by Michael Davis, was originating the loans and selling them to Mortgage Network, but was keeping the premiums and not buying title insurance to reimburse Mortgage Network or borrowers who incurred loses.

{¶ 6} Michael Davis quietly used another company he owned, Ameribanc Escrow Company, to conduct the closings on the 41 loans—a fact he concealed from Mortgage Network so the funds from new closings would help conceal the money he had siphoned off from Ameribanc Escrow Company's accounts. Michael Davis did not inform anyone of this and, at all times, he represented himself to be an agent of Ohio Bar Title to Mortgage Network. Mortgage Network even paid a premium for policies of title insurance to Buckeye Land Title. The funds were kept by the Davises.

{¶ 7} Eventually, Mortgage Network was forced to pay over $6,000,000 as a result of the fraud of Michael Davis and Ameribanc Mortgage. Mortgage Network requested reimbursement of the funds from Ohio Bar Title under the terms of the closing protection letter. Ohio Bar Title refused payment, arguing that the closing protection letter had no force or effect absent a valid policy of title insurance.

{¶ 8} In granting summary judgment, the trial court found that because no premiums were paid to Ohio Bar Title, no consideration was provided to Ohio Bar Title for the closing protection letter with respect to the 41 loans from 2003. The trial court rejected Mortgage Network's position that because Ohio Bar Title received over $1,000,000 in premiums on other policies and because Ohio Bar Title received the benefit of the business relationship with Mortgage Network, more than ample consideration had been paid to Ohio Bar Title for the overall protection of the closing protection letter title. Based upon its finding of no consideration for the promise in the closing protection letter as to the 41 loans in 2003, the trial court granted its judgment for Ohio Bar Title.

{¶ 9} The trial court also found, as a second basis for denying liability, that the closing protection letter titles applied only to closings conducted by Buckeye Land Title. Because Ameribanc Escrow Company was actually conducting the

closings, the trial court found no liability under the express terms of the closing protection letter.

{¶ 10} As a third theory for granting summary judgment, the trial court found that no valid commitments for title insurance policies were made because only the schedules A and B were provided and not the policy jacket. Without valid commitments for title insurance being in place, the conditions necessary for the closing protection letter to be enforced were not met.

{¶ 11} If the trial court was correct as to any of these three theories, its granting of summary judgment for Ohio Bar Title was correct. If genuine issues of material fact are present as to any of the three issues or the trial court misinterpreted the pertinent law, then the trial court's granting of summary judgment was in error. We will consider each theory independently.

### AGENCY LAW & THE DOCTRINE OF APPARENT AUTHORITY

{¶ 12} Agency is the relationship that results when one party agrees to another person or entity's acting on its behalf. Williston on Contracts (4th Ed.1992), Section 35:1. The former becomes the "principal," and the latter is the "agent." Generally speaking, if the agent enters into a contract on behalf of the principal, the principal will be bound by the terms of that contract, so long as the agent was acting with actual or implied authority to enter into the contract.

{¶ 13} All that is required to form an agency relationship is consent by both parties. Consideration is not required. The duration of an agency relationship may be specified or unspecified—it may be for a stated period, to continue until the occurrence of a stated event, or may continue indefinitely until expressly destroyed or disavowed.

{¶ 14} The relevant facts here demonstrate that Mortgage Network believed that Buckeye Land Title was Ohio Bar Title's duly authorized agent, based on the closing protection letter Ohio Bar Title issued to Mortgage Network on July 6, 2000. The letter stated:

The protection herein offered will be effective upon issuance by the Company of this letter and will continue until cancelled by written notice from [Ohio Bar Title].

{¶ 15} Ohio Bar Title notes that Michael Davis expressly revoked the parties' agency relationship by a letter dated June 11, 2001. The letter did terminate the parties' agency relationship. However, Mortgage Network had no notice that Buckeye Land Title ended its relationship with Ohio Bar Title. In fact, Michael Davis notified no one except Ohio Bar Title of the contents of the letter. He concealed his action even from his wife.

{¶ 16} Buckeye Land Title had actual authority to act as Ohio Bar Title's agent until Michael Davis terminated the relationship on June 11, 2001. However, because Ohio Bar Title failed to notify Mortgage Network that Buckeye Land Title was no longer its agent, Ohio Bar Title is liable for the losses on subsequent closings involving Mortgage Network based on the doctrine of apparent authority.

{¶ 17} Ohio Bar Title was in a position to know what Michael Davis and his affiliated entities were doing, and it was obligated to notify any third party that might believe that Buckeye Land Title was Ohio Bar Title's duly authorized agent that in fact Michael Davis was not. Indeed, Michael Davis had personally been an agent for Ohio Bar Title before he helped set up Buckeye Land Title. He had begun his practice of taking escrow funds during the time he was a personal agent for Ohio Bar Title. He ended the relationship between Buckeye Land Title and Ohio Bar Title when Ohio Bar Title threatened to audit his escrow accounts. The June 11, 2001 letter was issued two days before the scheduled audit. For some unknown reason, Ohio Bar Title let the matter drop after the letter was issued.

{¶ 18} Ohio Bar Title continued to issue policy documents for almost six months after the June 11 letter, albeit as to closings that occurred prior to June 11, and failed to object to those transactions in a timely manner. Construing the facts most favorably to Mortgage Network, we conclude that Michael Davis could be found to have acted with implied authority.

PRINCIPAL LIABILITY FOR CONTRACTS ENTERED INTO
BY AN AGENT WITH APPARENT AUTHORITY

{¶ 19} The first and primary basis the trial court found for granting Ohio Bar Title's motion for summary judgment was that because Michael Davis and his entities did not forward the money for the insurance policy premiums to Ohio Bar Title, Ohio Bar Title did not receive any consideration for the policies and that therefore it was not bound by the policies' terms. We disagree with the trial court's analysis because the Davis entities accepted the policy premium payments with apparent authority to serve as Ohio Bar Title's agent. Mortgage Network paid the Davis entities the premiums for title insurance in reliance upon the apparent agency relationship.

{¶ 20} To state the obvious, insurance policies are contracts. See, e.g., *United States v. Tilleraas* (C.A.6, 1983), 709 F.2d 1088, 1091 ("Insurance is a contract where one undertakes to indemnify another against loss"). Contracts are agreements between two or more parties, to do or not to do a particular thing, which are enforceable by law or equity. *Yoder v. Hurst,* Franklin App. No. 07AP–121, 2007-Ohio-4861, 2007 WL 2729423, at ¶ 6; *Ratchford v. Proprietors'*

*Ins. Co.* (1989), 47 Ohio St.3d 1, 8, 546 N.E.2d 1299. Generally speaking, the party seeking to enforce a contract must prove that a valid contract exists, which means that the party must demonstrate that there was an offer and an acceptance ("meeting of the minds") and that the parties' agreement was supported by consideration. See id.; *Powell v. Grant Med. Ctr.* (2002), 148 Ohio App.3d 1, 771 N.E.2d 874. "Consideration" is basically something given or promised—quid pro quo—a bargained-for legal benefit or detriment given in exchange. *Minster Farmers Coop. Exchange Co., Inc. v. Meyer,* 117 Ohio St.3d 459, 464, 2008-Ohio-1259, 884 N.E.2d 1056, ¶ 28.

{¶ 21} The trial court's determination that Ohio Bar Title did not receive consideration for title-insurance policies concerning the 41 mortgages at issue was based on the fact that the Davis entities kept the money Mortgage Network paid for those premiums. "[I]t is undisputed that [Mortgage Network] paid no * * * premium * * *. In fact, the premiums paid to Buckeye * * * were intended policy premiums which never reached Ohio Bar because Davis embezzled and/or misappropriated them." The trial court, thus, confused payment of consideration and receipt of that payment. The fact that Ohio Bar Title did not actually receive the money Mortgage Network paid is irrelevant, because Mortgage Network believed it was paying the premiums to a duly authorized agent of Ohio Bar Title. For purposes of a motion for summary judgment, this belief could be found to be based on Ohio Bar Title's closing protection letter.

{¶ 22} Thus, the trial court's determination that there was no enforceable contract based on lack of consideration was erroneous. Ohio Bar Title's failure to advise Mortgage Network that Michael Davis was no longer an authorized agent left Mortgage Network with a reasonable belief that Davis and his entities could act on behalf of Ohio Bar Title. At least at the summary judgment stage, Mortgage Network could be considered an innocent third party that relied on Ohio Bar Title's closing protection letter. At this stage, Ohio Bar Title cannot avoid indemnifying Mortgage Network for lack of consideration for the closing protection letter.

{¶ 23} We, therefore, hold that the trial court erred in its primary reason for granting summary judgment.

### THE ALTER EGO DOCTRINE

{¶ 24} The trial court's second basis for granting summary judgment was that Ohio Bar Title was not liable on the 41 closings at issue here because they were conducted by Ameribanc Escrow Company, and not Buckeye Land Title, which was specified in Ohio Bar Title's closing protection letter. This analysis fails to consider the fact that both of these entities are closely held by the Davises, and that Michael Davis had nearly exclusive control over both. This

basis also ignores the fact that Davis routinely conducted his closings using Ameribanc Escrow Company—a fact known by Ohio Bar Title and accepted by it.

{¶ 25} Because Michael Davis could control and manipulate both Buckeye Land Title and Ameribanc Escrow Company, they could be considered alter egos of each other and of Michael Davis personally. See generally *Bucyrus–Erie Co. v. Gen. Prods. Corp.* (C.A.6, 1981), 643 F.2d 413, 418, citing *State ex rel. Atty. Gen. v. Std. Oil Co.* (1892), 49 Ohio St. 137, 30 N.E. 279. Corporations are generally distinct, separate entities from their shareholders. But when a shareholder or corporation principal hides behind a corporate entity to commit fraud, public policy requires that the corporate identity be disregarded. See id. This is known as piercing the corporate veil using the alter ego doctrine.

{¶ 26} Genuine issues of material fact exist as to the relationship of the Davises and their various entities. Further, closing documents generated in conjunction with the closing of the 41 loans in question indicated that Buckeye Land Title was involved in the closing of the loans. The actual role of Buckeye Land Title in the closing presents additional issues of material fact. These genuine issues of material fact make summary judgment inappropriate on the theory that Buckeye Land Title did not act in conjunction with the closing of the 41 loans.

### Waiver/Excuse of Conditions Precedent

{¶ 27} Ohio Bar Title claims, and the trial court found, that policy jackets are required for a valid commitment of title insurance. Thus, Ohio Bar Title argues that the use of policy jackets is a condition precedent to the existence of and the enforcement of the policy. That being the case, if a condition precedent fails because the promisor intended it to fail, that failure will not invalidate the underlying contract. See Restatement of the Law, Contracts (1932), Sections 295, 297, comment ("If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused").

{¶ 28} In contract law, a condition precedent is "any operative fact that will create some new legal relation or extinguish an existing relation." Restatement of the Law, Contracts (1932) Section 250, Comment *a*; *Mumaw v. W. & S. Life Ins. Co.* (1917), 97 Ohio St. 1, 11, 119 N.E. 132. The condition, of course, must be something in addition to the offer, acceptance, consideration, legality of the contract, and so on. Id.

{¶ 29} Here, the Davis entities caused the policies to be written and delivered without policy jackets. As Ohio Bar Title's apparent agent, Buckeye Land Title's error or omission in failing to issue policy jackets is attributed to Ohio Bar Title.

Thus, Ohio Bar Title cannot disaffirm liability on the policy because its apparent agent caused a condition precedent to fail. Although Buckeye Land Title was no longer officially Ohio Bar Title's agent then, Ohio Bar Title's failure to notify Mortgage Network of the termination of the relationship left Mortgage Network in a position to believe Buckeye Land Title was issuing actual policies, based upon two schedules being provided. Accordingly, the trial court's third basis for granting summary judgment was also erroneous.

{¶ 30} In sum, because Ohio Bar Title failed to notify Mortgage Network that Michael Davis's company was no longer an authorized agent, Ohio Bar Title cannot disaffirm the contracts entered into by its agent. We therefore sustain the single assignment of error, reverse the decision of the Franklin County Court of Common Pleas, and remand this case to the trial court for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

PETREE and SADLER, JJ., concur.

SADLER, Judge, concurring.

{¶ 31} I concur in the judgment, and I concur in the majority's resolution of the assignment of error based upon apparent agency. However, because the apparent agency theory is sufficient basis upon which to reverse the grant of summary judgment, I would not go on to separately consider the issues of lack of consideration or alter ago.

{¶ 32} The promises in Ohio Bar Title's protection letter may be enforceable as part of any title insurance policy that Mortgage Network can prove it reasonably believed it had purchased through Ohio Bar Title's agent, Ameribanc Mortgage. There are genuine issues of fact as to whether Ohio Bar Title intentionally or negligently held Ameribanc Mortgage out as possessing the authority to do the acts in question, including the collection of title insurance policy premiums (consideration) and the conducting of closings (or the representation that it had done so, by listing itself on the HUD–1 statement, regardless whether it or its "alter ego" *actually* conducted them); and whether Mortgage Network reasonably believed that Ameribanc Mortgage possessed that authority at all relevant times. See *Master Consol. Corp. v. BancOhio Natl. Bank* (1991), 61 Ohio St.3d 570, 575 N.E.2d 817, syllabus; see also *Ammerman v. Avis Rent A Car Sys., Inc.* (1982), 7 Ohio App.3d 338, 7 OBR 436, 455 N.E.2d 1041; *Huntington Natl. Bank v. Am. Natl. Bank* (June 17, 1993), Cuyahoga App. No. 62680, 1993 WL 215402.

{¶ 33} For these reasons, I concur in sustaining Mortgage Network's assignment of error and in reversing the summary judgment. Insofar as the majority

opinion relies upon these reasons, I concur in it as well, and I respectfully decline to join in the balance of the opinion.