[Cite as *Dardinger v. Anthem Blue Cross & Blue Sheild*, 98 Ohio St.3d 77, 2002-Ohio-7113.]

DARDINGER, EXR., *v.* ANTHEM BLUE CROSS & BLUE SHIELD ET AL., APPELLEES.

[Cite as *Dardinger v. Anthem Blue Cross & Blue Shield,* 98 Ohio St. 3d 77, 2002-Ohio-7113.]

*Insurance — Denial of payments for treatments for brain cancer — Breach of contract — Bad-faith claim — Punitive damages excessive under Ohio law, when — Remittitur ordered, when — Charitable fund created at James Cancer Hospital with portion of punitive damages award.*

(No. 2001-1222 — Submitted April 24, 2002 — Decided December 20, 2002.)

APPEAL from the Court of Appeals for Licking County, Nos. 99 CA 127 and 99 CA 136.

_____

PFEIFER, J.

Factual Background

{¶1}     There are two factual portions of this case relevant to our determination. The first set of facts is that which gives rise to the claims of the plaintiffs for breach of contract, bad faith, and punitive damages. The second set of facts is relevant in determining whether defendant Anthem Insurance Companies, Inc., waived a possible defense.

The Claim

{¶2}     The plaintiff-appellant in this case is Robert Dardinger, executor of the estate of his wife, Esther Dardinger. There are two defendants-appellees. The first is Community Insurance Company, an Ohio corporation that does business under the trade name Anthem Blue Cross and Blue Shield ("Anthem"). Anthem is a wholly owned subsidiary of the second defendant-appellee, Anthem Insurance Companies, Inc. ("AICI"), which was once known as Associated Insurance Companies, Inc.

{¶3}     The plaintiff and the defendants are before this court because of what happened to Esther Dardinger as she fought her battle against brain cancer in 1997. Esther died on November 6, 1997, at age 49. Her last days were spent in great pain as the cancerous tumors in her brain took their final, brutal toll. The plaintiff claims that the way defendants handled Esther's chemotherapy needlessly shortened her life and caused her last days to be more painful than they should have been.

Pre-July 1997

{¶4}     In October 1996, Esther was diagnosed with metastatic brain tumors. The

cancer had spread from her breast. Esther underwent radiation therapy, which stabilized, but did not shrink, the tumors. In March 1997, Dr. Herbert Newton, the director of neuro-oncology at the James Cancer Hospital and Solove Research Institute at the Ohio State University ("OSU"), began treating her. Dr. Newton recommended that Esther begin intra-arterial chemotherapy ("IAC") in order to shrink the tumors. The neuro-oncology tumor board at OSU agreed with Dr. Newton's assessment and recommendation.

{¶5} IAC delivers chemotherapy to brain tumors by means of an arterial catheter threaded through whichever artery is feeding the area of the brain where the tumor is located and into the brain. The purpose of IAC is to deliver substantially higher doses of chemotherapy directly to the affected tumors without subjecting the rest of the body's organs to the drugs' toxicity.

{¶6} Beginning in April 1997, Esther began a course of IAC. She had IAC treatments in early April and early May. The IAC treatments seemed to be working for Esther, shrinking the tumors, relieving pain, and alleviating symptoms. An MRI taken on June 5, 1997, after the first two treatments, showed that the largest of the three tumors had shrunk significantly, a second had also shrunk, and a third had nearly disappeared. She underwent another round of IAC on June 10 and 11, 1997, and, again, tolerated the procedure well. Dr. Newton scheduled a fourth procedure for June 30 and July 1, 1997.

{¶7} It is the fourth procedure and its aftermath that are the focus of this case. Anthem decided, after approving and paying for the first three treatments of a planned 12-treatment program, that it would no longer pay for Esther's IAC treatments. Although Anthem's decision to halt payment for treatments was reported to Dr. Newton just before the fourth treatment, he and the Dardingers decided to move forward with that treatment, assuming that Anthem's denial was merely a glitch in the system. Esther received her fourth IAC treatment on June 30 and July 1. Newton planned to appeal Anthem's denial through Anthem's administrative process.

{¶8} Anthem believes that the only glitch in its system was in allowing the first three IAC treatments to proceed. Anthem places the blame for that decision on its medical director for the Columbus area, Dr. Stanley Borg. Before Esther's first treatment, Anthem had requested the opinion of a professional consultant and board-certified oncologist, Dr. John Pancoast. However, Dr. Pancoast was out of town and would not return before Esther's first IAC treatment.

{¶9} With Dr. Pancoast unavailable, Dr. Borg exercised his own authority and

2

preapproved payment for one IAC treatment. After its own Columbus Area Medical Director precertified the first treatment, two of Anthem's nurses precertified payment for the next two IAC administrations.

{¶10} By the time of the fourth treatment, Dr. Pancoast had become available to review Dr. Newton's request for precertification of Esther's fourth IAC cycle. An Anthem precertification nurse sent Dr. Newton's June 24, 1997 request for the treatment to Dr. Pancoast for his opinion. According to Dr. Pancoast's records, he spent ten minutes reviewing the request. His records also reflected that he had approved IAC for another of Dr. Newton's brain tumor patients (that patient's tumor was primary, not metastatic) just before his denial of Esther's IAC. Dr. Pancoast felt that Dr. Newton had no scientific literature to show that the treatment was nonexperimental in the treatment of brain metastases. Dr. Pancoast recommended that Anthem decline payment for the treatment.

{¶11} On June 27, 1997, Anthem informed Dr. Newton that payment for the requested IAC would be denied because the treatment was experimental. Anthem's reasoning for denying payment for the procedure changed over time. In a letter sent to Dr. Newton's office the same day as the phone call, Anthem said that coverage was denied because IAC should be done on an outpatient rather than inpatient basis. In other correspondence, Anthem cited the reasons for its denial as "not meeting medical policy for 'Off-Label Use of Drugs,' " because "the services do not meet the criteria of our medical policy," and because the drugs had not been approved for the treatment requested.

July

{¶12} Upon learning that Anthem had denied coverage, the Dardingers immediately tried to get Anthem to reconsider. On July 2, the Dardingers' insurance agent from Ohio Benefits Group, Tammy Kornja, spoke with Stephanie Hughes, an Anthem service representative, regarding the denial. Hughes told Kornja that she should have Dr. Newton call Anthem to speak to a physician about the situation. Kornja called Anthem again on July 17 to check on the status of the situation, but Hughes had nothing to report.

{¶13} Plaintiff, Bob Dardinger, was also trying to get answers from Anthem. On July 7, he called Anthem and talked to Beth Jones, a precertification nurse. While understanding that OSU would be handling the official appeal of Anthem's decision, Bob called to see what he could do to expedite the situation. He wondered why the treatment that Esther's doctor said would give her the best chance to survive had been refused by Anthem. He was told to talk to his doctor, that OSU would be handling the appeal, and to wait out the

appeals process.

{¶14}  OSU began preparing for the appeal internally as of July 1, 1997.  Mary Ann Slivka, a nurse working with Dr. Newton, wrote a letter to OSU's Patient Care Resource Management ("PCRM") Department requesting its assistance on Esther's appeal.  She gave the department background on Esther's treatment and Anthem's reasons, as stated in its telephone call of June 27, for denying coverage.  She wrote another letter to the PCRM Department on July 7, since Anthem's letter of denial had stated a different reason—that the service did not require an inpatient admission—than Anthem had given in its original phone call.  Carol Barnett, an OSU PCRM employee, was assigned to write the appeal.

{¶15}  Toward the end of July, Esther was feeling well enough for the Dardingers to take a vacation sightseeing and hiking in Kentucky and Tennessee.  On July 29, Esther had another MRI, and Dr. Newton was encouraged by the results.  Esther's third and fourth cycles of IAC had kept her stable with perhaps a little more shrinkage.  Newton testified that Esther was still living a "pretty full" life, while trying to work and handle domestic activities.  Dr. Newton testified that "her quality of life was still good."

{¶16}  Meanwhile, Kornja had called Anthem again on July 24, and Hughes told her that Esther's procedure had been approved.  Kornja immediately called Bob, but she was not able to reach him until July 31.  Bob told Esther that same day, and they believed that they were "back on track."

August

{¶17}  Esther and Bob's enthusiasm over their belief that Anthem would pay for the continuation of IAC treatments was short-lived.  On August 12, Kornja received a call from Hughes and Rae Schmidt, an "internal service person" from Anthem.  Hughes told Kornja that she had erred in telling Kornja that Esther's treatment had been approved.

{¶18}  The task of telling Esther fell to Bob:

{¶19}  "I said, what we thought was true isn't.  I just kind of blurt[ed] it out.  I couldn't think of any way to discuss it so I just said the appeal wasn't really approved.  They are still denying the payment.  It doesn't look like we are going to get back on track."

{¶20}  Esther was "crushed" by the news.

{¶21}  The Dardingers met with Dr. Newton in August to discuss options.  Dr. Newton recommended continuing with IAC.  He did not want Esther's treatment to be delayed because of financial issues.  Neither did Bob.  But Esther was concerned about the financial impact of what the Dardingers believed could become over $100,000 in medical

bills. They chose to wait and see what Anthem would decide. They were confident that they would have an answer by the end of August.

{¶22} Barnett had submitted the appeal to Anthem on August 5, 1997. Although the appeal arrived in Anthem's office on August 11, it was not processed until August 28, whereupon the file was closed. Anthem's Maggie Neely explained that the file was closed because the appeal came without accompanying medical records but that the file would be reopened when the records arrived. Anthem's physician-reviewer testified, however, that medical records were unnecessary for the resolution of Esther's appeal, since the relevant question to Anthem was whether the procedure was experimental. Despite the fact that Barnett had included in the August 5 "appeal packet" Esther's MRI and office notes relevant to her procedure, Anthem closed the file because the packet appeal did not contain "all" of Esther's medical records in connection with the appeal.

{¶23} Barnett had identified herself in the appeal as the contact person if Anthem required additional information. Indeed, she had phoned Anthem on August 20, 1997, to check on the status of the appeal. She was not told of any deficiencies regarding the appeal at that time. She was told somewhat to her surprise, however, that Anthem had 120 days to resolve the appeal. In addition, one of Anthem's employees, June McFarland, actually worked at OSU handling insurance issues. Rather than contact either Barnett or McFarland, Neely followed Anthem procedure and sent a form letter dated August 28, 1997, to the OSU Medical Records Department asking for Esther's medical records. Neely testified that Anthem procedures prohibited her from contacting Barnett, or any other provider, by telephone. And she did not send a copy of the letter to either Barnett or Newton.

{¶24} Anthem claims in its brief to this court that the appeal paperwork about Ether's chemotherapy for her brain cancer "said nothing about urgency" and did not mention plans for further IAC treatments. It had 120 days under the contract to resolve the appeal. By contract, time was not of the essence. Reality proved otherwise.

September

{¶25} At the beginning of September, Dr. Newton met again with the Dardingers. While still recommending IAC, Dr. Newton told the Dardingers that Esther could try intravenous chemotherapy instead. The Dardingers decided that if they had not heard anything from Anthem by the middle of September, they would proceed with the intravenous chemotherapy treatment that Anthem would pay for. The Dardingers saw intravenous treatments as a way to stabilize the tumors until they could get the IAC issue resolved with

Anthem.

{¶26}   Having heard nothing from Anthem, on September 17, the Dardingers and Dr. Newton decided to try intravenous chemotherapy, despite the dangers associated with its toxicity.  Esther did not tolerate the procedure well.  In Bob's layman's terms, the IV chemotherapy "burned out her bone marrow."  The effects were drastic.  After Bob brought her home on September 17, she was never again able to do anything but lie around due to her nausea and fatigue.  On September 29, Esther had grown so ill from the chemotherapy that she was confined to the hospital for two weeks, where she was given multiple transfusions and injections in an effort to stabilize her.

{¶27}   Meanwhile, Esther's cancer had grown worse.  An MRI taken on September 29 showed dramatic growth in the tumors.  That upset and frustrated Dr. Newton, who believed that the growth would not have occurred had the IAC treatments continued.

{¶28}   Throughout September, neither OSU nor the Dardingers had heard anything definitive about the progress of the appeal.  In late September, Barnett called Anthem on her own initiative to check the status of the appeal.  At that point, she learned for the first time that Anthem had closed the file because all of the medical records had not been sent.  She spoke to a person at Anthem, got an address in Canton to send the records, and immediately ordered them to be mailed.

October

{¶29}   Barnett called the Canton office on October 6, and found that the records had been received on October 3.  Bob was also trying to find out where the appeal stood.  He attended a meeting at his job where Anthem representatives were present to respond to concerns that policyholders might have.  He told them Esther's story.  He asked where the appeal stood and wanted to know whether Anthem was reviewing her MRIs and considering how well she had done with IAC.  On October 9, Rae Schmidt called Bob and told him there was no update.  On October 10, she called again to tell him that the appeal did not have published information about the drugs used in the IAC.

{¶30}   Anthem employees knew about Esther's condition.  But they knew not to be forthcoming on information about the appeal.  On October 14, Anthem's Vi Blum sent an e-mail with the subject "URGENT: Esther Dardinger."  The body of the e-mail read:

{¶31}   "This is an FYI in case you get a call from ANYONE on this patient.

{¶32}   "* * *

{¶33}   "The patient has cancer.  We paid in error for three admissions, then denied

6

subsequent. Patient stopped treatment. She is worse. Drug is not approved for treatment for the type of cancer she has.

{¶34} "DO NOT discuss details of the info in the following messages, only that it is in review in Indy.

{¶35} "This could/probably will end up in a suit."

{¶36} Meanwhile, the appeal was working its way through the Anthem/AICI bureaucracy. Its eventual destination was to AICI's Medical Policy Division in Indianapolis, where Anthem sent anything that "impacts our medical policy." Again, time did not seem to be a concern. On October 9, an Anthem employee in Cincinnati, Constance Wesseler, mailed a letter to Dr. Newton, requesting that he prepare a letter regarding the medical necessity of the June 27 admission in order to "facilitate this appeal."

{¶37} Some Anthem employees seemed to appreciate the urgency of the situation— on October 10, Joyce Walker, an appeals processor, planned to hand-deliver the appeal file to AICI in Indianapolis while she was there on other business. An internal Anthem e-mail of October 15 relates that AICI squelched that attempt to speed things up:

{¶38} "I found out yesterday that the case IS NOT in Indy yet. Apparently when Joyce Walker, Appeals person in HCPO, planned to take the case to Indy with her on Friday, 10-10, she found out that the Med Policy Review group wanted lots more info than she had at the time so they told her not to bring it!

{¶39} "* * *

{¶40} "Joyce is sending the pack out today for overnight delivery to Jolene Latta in Indy."

{¶41} AICI's Latta let the Anthem employees know that the pack they sent out was administratively deficient in an e-mail of October 20:

{¶42} "It is IMPERATIVE that you fill out the review forms in full, ESPECIALLY identifying the SOURCE or SENDER.

{¶43} "Without this information your case goes NO WHERE!!!! It will now be today before we can send out to a Peer Reviewer. If we had received the information needed on Friday, it would probably be coming BACK today!!!"

{¶44} Anthem's Vi Blum was advising urgency on the matter, but could get no commitment to a time frame from AICI. In an October 21 e-mail, she wrote:

{¶45} "Advd urgency. She said it could take awhile but would not commit to a time frame. Advd we/Rae are in close contact with the sub, dying wife, that it's in Murphy's

office etc. She said nurse has it now but it must go by mail to outside reviewer but they'd ask to FAX response and also took my FAX #.

{¶46} "I reiterated and reemphasized all points and she said she'd get it through as fast as possible."

{¶47} Well-meaning individuals could do nothing to overcome the bureaucracy. Anthem's Rae Schmidt in an October 21 e-mail writes:

{¶48} "I am darn near speechless on how this appeal has been handled by the other area (and we all know it is hard to get me to be speechless).

{¶49} "* * * If there is ANYTHING I can do to help this case get finalized please let me know. The urgency of the appeal has been lost in Anthem's red tape and that is a sad and embarrassing situation for Anthem.

{¶50} "I don't have any idea which way the decision for the appeal will go but, Bob and Esther Dardinger deserve to know Anthem's response so they can get on with whatever action they need to pursue."

{¶51} AICI finally forwarded the appeal file to Dr. James E. Schroeder, who received it on October 27, 1997. After a review of less than 30 minutes, Dr. Schroeder decreed that Esther's IAC treatment was experimental and not a therapy recognized as safe and effective for the treatment of metastatic brain cancer.

{¶52} Dr. Schroeder had no control over the information that Anthem chose to send him. At trial, Dr. Schroeder admitted that Anthem had not supplied him the medical literature about IAC that Newton had provided Anthem, that Anthem had not provided him with the treatment protocol that Newton sent to Anthem on March 3, 1997, that he did not have Barnett's August 5 letter detailing Esther's treatments, that he did not have any of Dr. Newton's medical records or his letters regarding Esther's positive response to IAC, that he did not have Esther's MRI scans or reports, that he did not consider the impact of OSU's Tumor Board's approval of the treatment, that he did not contact Newton for additional information, and that no one at Anthem told him about Esther's response to the treatments. Anthem did send Dr. Schroeder a copy of an internal e-mail explaining the reasons Esther's treatments should not be covered.

{¶53} Anthem followed Dr. Schroeder's opinion, and assigned LeeAnn Rossi, from its Provider Inquiry Department in Youngstown, to draft the letter denying benefits. She had not worked on Esther's case before that assignment. In the October 31, 1997 letter, Rossi wrote to OSU and the Dardingers that "the Appeals Committee has determined that no

benefits can be authorized." But Rossi testified that there was no such "committee" of people reviewing appeals at Anthem. There was only an appeals process. In the letter, Rossi wrote that the appeal was denied because the drugs used to treat Esther's cancer were not recognized as acceptable for treatment of breast or brain cancer. In fact, Anthem's Dr. Pancoast testified that the drugs were acceptable but that it was their delivery process, IAC, that was the problem. Ultimately, Rossi testified that she did not really know whether this was the reason for the denial—she said that she just wrote what she was told. After input and review from other people within the company and the legal department, she sent out the letter.

{¶54} In the meantime, Esther's overall condition had deteriorated throughout October. She was able to leave the hospital on October 11 after her 12-day stay combating the effects of the intravenous chemotherapy. The results of the latest MRI and the devastating effects of the intravenous chemotherapy persuaded the Dardingers to attempt another round of IAC, regardless of cost.

{¶55} On October 31, Esther went to OSU for outpatient surgery to install a port to make the IAC treatments easier. The port was installed, but Esther was so ill that she was admitted to the hospital.

{¶56} The tumors were seriously affecting Esther. Dr. Newton testified:

{¶57} "[S]he was having headaches, she was lethargic, she was sleeping a lot. I think she was nauseated. There were a lot of symptoms suggesting that she might be having further tumor growth and further damage to the brain from the tumors and she was admitted to try to stabilize some of the increasing pressure in her brain."

{¶58} At that time, another brain scan was performed, revealing little cause for any hope. Dr. Newton stated:

{¶59} "[T]he tumors were larger and, neurologically, she was very compromised and I did not think further chemotherapy was going to be possible at that point. I thought she was too ill and recommended that we not proceed with further attempts, intravenous or intra-arterial chemotherapy."

{¶60} Esther never had another IAC treatment.

November

{¶61} Esther died on November 6 of "brain stem compression from continued growth of her multiple brain tumors in her surrounding brain." Newton testified, to a reasonable degree of medical probability, that Esther would have lived eight months to two

years, "maybe longer," had she been able to continue with IAC. Dr. Newton also testified that, had IAC continued, a patient such as Esther would likely not have died from the brain tumors but from other systemic disease, such as lung or liver failure. Since brain tumors killed her, Esther's final days were marked by neurological compromise.

{¶62} Esther's funeral was November 10. The letter refusing payment for the IAC treatment arrived at her house on November 11.

Procedure

{¶63} The procedural facts revolve around the issue of AICI's liability in this case. The court of appeals found that Anthem and AICI were separate entities and owed separate duties to Dardinger. The appellate court found that AICI was merely a guarantor on the contract between Anthem and Dardinger. The trial court had found that any defense based on separate duties had been waived by AICI.

{¶64} Dardinger sued both Anthem and AICI. He alleged that both of the defendants "had a fiduciary duty to act in good faith toward Esther Dardinger in processing and paying her claims for necessary medical treatment and in authorizing her physicians to proceed with such treatments with an assurance that insurance coverage would be provided." Dardinger then alleged that both defendants had breached their duty to act in good faith and that the defendants' bad faith was the proximate cause of Esther's injury and death. Dardinger also brought claims for intentional infliction of emotional distress and wrongful death against both defendants.

{¶65} Defendants answered together. In the answer, AICI generally denied all of the allegations in the complaint, denying that it had ever insured Bob or Esther Dardinger. Anthem admitted that it had insured the Dardingers.

{¶66} AICI did not file a motion to dismiss the claims against it under Civ.R. 12(B)(6). Likewise, AICI did not assert in a motion for summary judgment that it could not be held liable for bad faith on a contract issued by its subsidiary. Instead, AICI and Anthem submitted their motion for summary judgment together. They wrote:

{¶67} "For purposes of this Motion only, all three named Defendants shall be deemed to be a single entity and shall be called 'Anthem.' "

{¶68} The motion for summary judgment was based on the doctrine of avoidable consequences, wherein defendants argued that Esther's suffering and death could have been avoided had she continued with IAC despite the lack of insurance coverage for it.

{¶69} Dardinger also filed a motion for partial summary judgment, predicated on

10

the breach-of-contract claim. Defendants responded together, and AICI made no argument that there was a lack of privity between it and the Dardingers.

{¶70} Defendants also jointly filed proposed jury instructions prior to trial, including instructions for breach of contract and bad faith. AICI never sought to distinguish itself from its codefendant in any of the jury instructions. Indeed, in submitting their instructions to the court, the defendants are again lumped together by counsel:

{¶71} "Defendants Anthem Blue Cross & Blue Shield, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield, and Anthem Insurance Co., Inc., aka Associated Insurance Company, Inc., aka The Associated Group (Anthem) hereby submit their proposed jury instructions."

{¶72} The defendants refer to themselves collectively as "Anthem." Their proposed instructions ask the jury to determine whether "Anthem" breached the insurance contract and state that "the plaintiff claims that Anthem's denial * * * constitutes bad faith."

{¶73} The two defendants acted as one at trial. They were represented by the same trial counsel; a single corporate representative appeared on behalf of both of them. In his opening statement, Anthem's counsel made no distinction between AICI and Anthem. He referred to the client only as "Anthem."

{¶74} Shortly before trial, Dardinger voluntarily dismissed the wrongful death claim. The case proceeded to trial on claims against both AICI and Anthem for breach of contract, bad faith, and intentional infliction of emotional distress.

{¶75} During Dardinger's case, evidence was admitted regarding AICI's substantial economic worth. Among other things, Dardinger was permitted to introduce AICI's 1998 Annual Report, which reflects net income of $172,000,000 from AICI's consolidated operations, which include subsidiaries in all 50 states. While defendants' counsel objected to the inclusion into evidence of AICI's annual reports and other financial matters, the objection was not based on AICI's separate status from Anthem. Instead, defendants' counsel objected to any testimony of "Anthem's" financial condition being allowed until after the issue of whether there would be a punitive damages award was resolved. Regarding punitive damages, counsel never distinguished between defendants.

{¶76} At the conclusion of Dardinger's case-in-chief, the counsel for the defendants sought a directed verdict on their behalf. In an aside, during his argument before the court, defendants' counsel stated:

{¶77} "Now, I will note, as a second branch to the same argument on the contract

issue, just with regard to AICI, the Indiana corporation which is a defendant here, it's at least worth noting for the record that AICI is on the contract as a guarantor only in the event that Community Insurance, the Ohio corporation, becomes financially unable to satisfy its obligation.

{¶78} "* * * The issue here clearly is not the failure of AICI to meet that guarantee obligation. There's no breach of any kind of obligation. There's no breach on AICI's behalf at all. *But the bottom line with respect to really both defendants, the easy way and the correct way to resolve this is simply by virtue of that, that there's no economic damage, no contract damage here whatsoever, Zero* [sic]. *And Mr. Dardinger has admitted that. So, that takes out the breach-of-contract claim.*" (Emphasis added.)

{¶79} In regard to the issue of bad faith, the following exchange occurred:

{¶80} "MR. MAIMAN [defendants' counsel]: And I would just start briefly once again with AICI, the Indiana corporation, because its only contractual obligation was this guarantee. And so—

{¶81} "THE COURT: I keep forgetting that. I do appreciate you reminding me of that.

{¶82} "MR. MAIMAN: And there's no bad faith arising out of that very limited relationship here. Now, as to Community Insurance Company, what's Ohio law?"

{¶83} In specifically seeking a directed verdict from the court, counsel never directly sought a directed verdict for either of the defendants separately.

{¶84} In Anthem's rebuttal after Dardinger's counsel had spoken in opposition to the motion, the trial court clarified to Anthem's counsel what it saw as AICI's potential liability:

{¶85} "THE COURT: He [Dardinger's counsel] believes that the issues concerning Anthem and Indiana being on the hook on the tort claims is because they make the medical decisions or policy decisions in Indiana."

{¶86} To this, Anthem's counsel responded, "We will get to the tort claims in just a minute." But defendants' counsel never returned to the issue of AICI's liability for bad faith.

{¶87} The trial court granted defendants a directed verdict on Dardinger's claim of intentional infliction of emotional distress but denied a directed verdict as to both defendants on the breach-of-contract and bad-faith claims.

{¶88} After the close of all evidence, defendants renewed their directed verdict motion:

{¶89} "Your Honor, I respectfully, on behalf of both defendants, renew the motion for directed a verdict that was made on Wednesday. Of course, the Court has already dismissed the claim for intentional infliction of emotional distress so that issue is moot at this point and I am not going to belabor those for the record. The Court knows the issues as we reviewed them. We respectfully request the Court, in light of yet another day, determine that the motion is well-taken and grant it."

{¶90} Again, no specific motion was made for AICI individually. The motion was denied. Before closing arguments, defendants objected to the jury interrogatories and jury instructions, stating:

{¶91} "[W]e object to the interrogatories and the jury instructions to the extent that they allow a bad faith claim to go to the jury even if the jury finds no breach of contract. It is our view under *Zoppo* [*v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397] and [its] progeny that you have got to have a finding of the breach of contract and from there you then determine whether the contract was breached through some kind of improper—for some kind of improper motive.

{¶92} "If you don't have a breach, we don't think it's possible to have bad faith under Ohio law."

{¶93} The objection was as to both defendants. Counsel for defendants made no objection to the form of the interrogatories, which did not distinguish between Anthem and AICI. Counsel did not move for separate interrogatories to be prepared for the individual defendants. Instead, the following interrogatories went to the jury:

Interrogatory A—Breach-of-Contract Claims

{¶94} "Did the Defendants breach the contract by not approving payment for intra-arterial chemotherapy based on the Defendants' determination the treatment was experimental or investigative as those terms are defined in the contract?"

Interrogatory B—Breach-of-Contract Claims

{¶95} "Did the defendants' failure to approve payment for intra-arterial chemotherapy based upon the defendants' determination the treatment was experimental or investigative cause plaintiff to suffer damages?"

Interrogatory C—Breach-of-Contract Claims

{¶96} "Did the defendants' failure to pre-certify plaintiff's in-patient admission for the fourth intra-arterial chemotherapy cause plaintiff to suffer damages[?]"

Interrogatory D—Breach-of-Contract Claims

{¶97} "State the total amount of compensatory damages due plaintiff as a result of defendants' failure to approve payment for the intra-arterial chemotherapy based on defendants' determination the treatment was experimental or investigative as those terms are defined in the contract."

Interrogatory E—Bad-Faith Claims

{¶98} "Did the defendants act in bad faith by denying plaintiff coverage for the intra-arterial chemotherapy?"

Interrogatory F—Bad-Faith Claims

{¶99} "Did the denial of coverage for intra-arterial chemotherapy proximately cause damages to the plaintiff?"

Interrogatory G—Bad-Faith Claims

{¶100} "Did the defendants process or handle plaintiff's insurance claim or appeal in bad faith?"

Interrogatory H—Bad-Faith Claim

{¶101} "Did the defendants' processing or handling of plaintiff's insurance claim or appeal in bad faith proximately cause damages to the plaintiff?"

Interrogatory I—Bad-Faith Claims

{¶102} "State the total amount of compensatory damages due plaintiff as a result of denying plaintiff's coverage for the intra-arterial chemotherapy in bad faith."

Interrogatory J—Punitive Damages Claim

{¶103} "Did the Defendants act with malice, aggravated or egregious fraud, oppression, or insult by acting in bad faith with regard to denying coverage of Plaintiff's [sic, decedent's] treatment and/or the processing or handling of Plaintiff's insurance claim or appeal[?]"

{¶104} In addition, each of the general verdict forms as to breach of contract, bad faith, and punitive damages referred to the defendants as "defendants." Again, counsel did not object to their form.

{¶105} In closing arguments, Dardinger's counsel cited "Anthem's" financial status, mentioning the $172 million net income figure from AICI's 1998 annual report, to argue for a large punitive damages award. Defendants' counsel did not object. Nor did counsel object to any other combined reference to Anthem and AICI in Dardinger's closing argument.

{¶106} The jury returned a verdict in favor of Dardinger and awarded him $1,350 on the breach-of-contract claim, $2.5 million on the bad-faith claim, and $49 million in punitive

damages. The trial court subsequently awarded attorney fees in the amount of $790,000. Defendants filed a post-trial motion seeking judgment notwithstanding the verdict, or a new trial, or a remittitur of the punitive damages.

{¶107} In the motion for judgment notwithstanding the verdict, AICI finally did try to distinguish itself from Anthem. It claimed that AICI had no contractual obligation to the Dardingers. AICI argued that its only contractual duty under the agreement at issue would arise only if Anthem was financially unable to meet its obligations. At that point, AICI would pay the claims owed by Anthem. AICI argued that since Anthem was never unable to meet its obligations, AICI thus owed the Dardingers no contractual duty, and "[w]ithout a contractual duty, there was no basis for a bad faith claim against AICI and, consequently, no basis for punitive damages to be assessed against AICI."

{¶108} The trial court was incredulous as to AICI's post-trial argument. It wrote:

{¶109} "After the pleadings have been filed, after motions for summary judgment have been ruled upon, after a jury has been empanelled and jury instructions submitted, and after a verdict has been rendered by the jury, now the defendant, Anthem Insurance Company, Inc., attempts to avoid liability by waiting until after all of the foregoing matters have occurred in this case to raise the issue that the defendant is a separate entity from the other defendant, Community Insurance Company [d.b.a. Anthem Blue Cross & Blue Shield]. Nowhere throughout the pleadings, nowhere throughout the defendants' arguments on the motion for summary judgment, and nowhere during the trial, especially during the discussions concerning jury instructions and the proposed instructions submitted by the defendants does the defendant, Anthem Insurance Company, Inc., raise the argument that it is not responsible in this matter. To say that the Court has been sandbagged on this issue is an understatement.

{¶110} "The court believes that the defendants have waived the argument presented."

{¶111} Additionally, the court added that that AICI could be found liable under an alter-ego theory because of its domination and control of its subsidiary, Anthem. The trial court also found that "the parent company was actively involved in the facts of this matter and did not sit back as a parent company overseeing the acts of the subsidiary. The defendant [AICI] was not only directly and actively involved but all of the actions of the defendant [Community Insurance Company] were undertaken pursuant to policies and procedures promulgated by the defendant, Anthem Insurance Company, Inc."

{¶112} AICI and Anthem appealed to the Fifth District Court of Appeals. The

appellate court found that the trial court had erred in not granting AICI's motion for a directed verdict. It found that AICI's obligation under the contract was simply that of a guarantor and that it could breach its obligation under the policy only if it refused to pay Anthem's obligations and liabilities in the event that Anthem became financially unable to do so. The court concluded that AICI never had a duty to pay for Esther's IAC because Anthem's refusal to pay was due to the nature of the treatment.

{¶113} The appellate court also rejected the trial court's attempt to "pierce the corporate veil" or find AICI liable under an alter-ego theory. The court found that had Dardinger sought to pierce the corporate veil, he would have had to present that remedy to the jury, and that he failed to do so. The court of appeals therefore found that it was improper for the trial court to make its finding after the conclusion of the trial.

{¶114} The appellate court concluded that without a contractual obligation, AICI could not be held liable for bad faith and could not be exposed to punitive damages or attorney fees for bad faith.

{¶115} The court upheld the jury's verdicts against Anthem for breach of contract and bad faith. However, the court remanded the matter to the trial court for a new trial as to the issue of damages against Anthem, "since the jury interrogatories did not separately indicate the amount of the judgment rendered against each appellant." The court found that the jury's verdict, as to damages, was "based upon the combined financial information of both AICI and Anthem."

{¶116} Since the court sent the case back for retrial as to damages, the court of appeals found all of the defendants' assignments of error regarding the excessiveness of punitive damages to be moot.

{¶117} Finally, the court of appeals found that the trial court abused its discretion when it allowed Dardinger to introduce the personal salaries of Anthem executives in evidence.

{¶118} The cause is before this court upon the allowance of a discretionary appeal.

Law and Analysis

{¶119} The issues before us include whether AICI waived its possible contract defense to Dardinger's claim, whether the jury's punitive damages award was acceptable under Ohio law and the federal Constitution, and whether the trial court erred in allowing testimony regarding the salaries of executives employed by defendants. We address those issues separately.

Waiver

{¶120} In the 1942 film *Casablanca*, Captain Renault orders Rick's Café Americain closed, acting on the orders of German Major Strasser. He needs a pretense to explain the closing when Rick, the proprietor, demands an explanation. "I'm shocked, shocked to find that gambling is going on in here!" says Renault. A croupier comes from the gambling room and approaches Renault. He hands him a roll of currency: "Your winnings, sir."

{¶121} In this case, AICI in its brief describes the trial judge's finding that AICI had waived its possible defense of lack of privity as "shocking." This alleged outrage comes despite AICI's participation in and perpetuation of the impression that Anthem and AICI were indistinguishable as to their potential liability to Esther Dardinger's estate—both before and during the trial. AICI's expression of shock is as transparent as Renault's. We agree with the trial judge that through its participation and perpetuation, AICI waived the argument that it lacked privity with Esther.

{¶122} Every trial has many potential lives. It could be argued that had this case evolved differently, it may well have been error for the trial judge to determine that there was contractual privity between Dardinger and AICI. However, "[i]t is the well-settled rule that a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *Lester v. Leuck* (1943), 142 Ohio St. 91, 92, 26 O.O. 280, 50 N.E.2d 145; *State ex rel. Johnson v. Ohio Adult Parole Auth.*, 95 Ohio St.3d 463, 2002-Ohio-2481, 768 N.E.2d 1176.

{¶123} In *State v. Kollar* (1915), 93 Ohio St. 89, 91, 112 N.E. 196, this court held:

{¶124} "The law imposes upon every litigant the duty of vigilance in the trial of a case, and even where the trial court commits an error to his prejudice, he is required then and there to challenge the attention of the court to that error, by excepting thereto, and upon failure of the court to correct the same to cause his exceptions to be noted.

{¶125} "It follows therefore that, for much graver reasons, a litigant cannot be permitted, either intentionally or unintentionally, to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible."

{¶126} We do not need to determine whether it was part of an active strategy for AICI to fail to distinguish itself from Anthem throughout the life of this case. We need only determine that it did fail to do so. The record is full of examples.

{¶127} Had AICI wanted to establish the lack of a contract between it and Dardinger,

it could have done so in pretrial motions. However, AICI filed no pretrial motions on its own behalf. It filed no motion to dismiss. In the motion for summary judgment, AICI took pains to combine itself with Anthem. It wrote that "all three named defendants shall be deemed to be a single entity and shall be called 'Anthem.' " Within that motion, AICI never raised the argument about a lack of privity between it and Dardinger. Instead, AICI raised the doctrine of avoidable consequences. It charged that Esther should have continued the IAC treatments on her own or that OSU should have or would have provided them for free.

{¶128} AICI had another chance before trial to raise the contract issue. Dardinger filed his own motion for summary judgment on the contract issue, which AICI contested. Again, AICI combined itself with Anthem in contesting Dardinger's motion, again failing to raise the supposedly pivotal issue of AICI's status as a mere guarantor on the contract.

{¶129} AICI had yet another chance before trial to establish its independent identity. It did not. In submitting its proposed jury instructions prior to trial, AICI specifically combined itself with Anthem. The instructions noted that Anthem and AICI would simply be referred to together as "Anthem" in the instructions. The instructions then went on to ask whether that combined entity, "Anthem," breached the insurance contract. AICI thus made it clear to the trial court that the key question in the case was whether AICI and Anthem together had breached the contract. Neither AICI nor Anthem submitted any proposed jury instructions that asked whether those supposedly discrete entities had breached the contract or acted in bad faith on their own.

{¶130} The trial, too, was a combined effort. The defendants did not attempt to present Anthem and AICI as distinguishable to jurors. The defendants were represented by the same counsel and a single corporate representative appeared on their behalf. From the opening statement, defendants' counsel referred to them as a single entity, Anthem.

{¶131} AICI argues that a key factor in the jury's large punitive damages award was the inclusion in evidence of AICI's annual reports. Defendants' counsel did object to that inclusion and to other evidence regarding the financial status of AICI. However, those objections were not based on any notion of discrete corporate identities. Instead, the objections were based on defendants' argument that no evidence of "Anthem's" finances should be admitted until after the jury had determined that punitive damages were warranted. AICI did not argue that its status as a guarantor made its finances irrelevant.

{¶132} After pretrial and trial processes in which AICI perpetuated the notion that AICI and Anthem were not distinguishable as to Dardinger, the defendants moved for a

directed verdict. The basis of the motion as to breach of contract was that Dardinger had failed to prove any damages. In defendants' counsel's argument to the judge, he did mention that "it's at least worth noting for the record that AICI is on the contract as a guarantor only." He continued, "The issue here clearly is not the failure of AICI to meet that guarantee obligation. There's no breach of any kind of obligation. There's no breach on AICI's behalf at all."

{¶133} In those few lines within 40 pages of argument for a directed verdict, AICI did mention its contract status. But AICI immediately shrugged that off as a reason to grant a directed verdict. Defendants' counsel quickly let the court know the true basis of the argument:

{¶134} "But the bottom line with respect to really both defendants, the easy way and the correct way to resolve this is simply by virtue of that, that there's no economic damage, no contract damage here whatsoever, Zero [sic]. And Mr. Dardinger has admitted that. So, that takes out the breach-of-contract claim."

{¶135} AICI made it clear that its motion was based on the failure of Dardinger to prove any contract damages. In addition, defendants' counsel made no specific motion for directed verdict as to AICI itself.

{¶136} Again, in addressing bad faith, defendants' counsel made a brief aside as to AICI's contract status, but never specifically requested the court to rule on AICI's behalf because of that status. Regarding punitive damages, counsel never distinguished between Anthem and AICI.

{¶137} During the argument of the first directed verdict motion, the court offered its interpretation of Dardinger's basis for AICI's potential liability—"the issues concerning Anthem and Indiana being on the hook on the tort claims is because they make the medical decisions or policy decisions in Indiana." AICI never responded to the court's statement.

{¶138} When AICI and Anthem renewed their motion for directed verdict after they concluded their case, AICI again made no specific motion as to itself based upon its position as a guarantor. The perpetuation of the notion of a combined entity continued.

{¶139} AICI had another chance to distinguish itself from Anthem in objecting to the jury instructions and interrogatories. AICI did object, but again joined with Anthem, and again their objection had nothing to do with AICI's status as guarantor. They objected to the possibility of the issue of bad faith going to the jury absent a finding of breach of contract.

{¶140} The jury interrogatories and general verdict forms were reviewed by AICI.

They called for the jury to determine whether "defendants" had breached the contract, committed bad faith, and caused damages. No distinction was made between the defendants, and AICI sought no distinction. If AICI really believed that it was legally impossible for it to be found liable, then it knowingly let faulty interrogatories go to the jury. It knowingly encouraged the tainting of the jury's verdict. And now it seeks relief from that verdict.

{¶141} For the first time, in its motion for judgment notwithstanding the verdict, AICI clearly asked to be considered separately from Anthem. It specifically sought judgment on its own, due to its separate corporate identity, claiming that it was liable only as a guarantor under the contract between Anthem and Dardinger. The trial judge, who presided over a long and complex trial and pretrial preparation and was witness to the whole picture that AICI presented of itself, was incredulous: "To say that the Court has been sandbagged on this issue is an understatement." We believe that the trial judge spoke a blunt truth.

{¶142} AICI did, in its answer, deny that it had ever insured the Dardingers. In *Gallagher v. Cleveland Browns Football Co.* (1996), 74 Ohio St.3d 427, 659 N.E.2d 1232, we addressed another case in which, as here, the defendant asserted a defense in its answer that it failed to reassert either before or during the trial, before raising it as a part of a motion for judgment notwithstanding the verdict. In *Gallagher*, the plaintiff, a sportscaster, had been injured near the field of play while videotaping a Cleveland Browns game. The Browns maintained in its answer that Gallagher had assumed the risk and proceeded with that theory at trial. During the trial, the Browns failed to distinguish between primary and secondary assumption of the risk, even though primary assumption of the risk may have been a complete defense to Gallagher's claims. The Browns did not specifically assert primary assumption of the risk until its motion for judgment notwithstanding the verdict.

{¶143} What this court wrote about primary assumption of the risk could be written as to AICI's contract defense in this case:

{¶144} "Because [the defense] prevents a plaintiff from establishing the duty element of a negligence case and so entitles a defendant to judgment as a matter of law, it is an issue especially amenable to resolution pursuant to a motion for summary judgment. Yet appellees never moved for summary judgment or attempted in any other way to call primary assumption of risk to the trial court's attention prior to trial. In most cases, when a defendant potentially has a full and complete defense available that would defeat a plaintiff's prima facie negligence case, one would expect that defendant to raise that defense as soon as possible in an attempt to prevail without going to trial. Although there is no suggestion in

Civ.R. 56 that a party who fails to make a motion for summary judgment on a particular issue waives the right to raise the issue, judicial economy favors raising an issue on which the moving party claims entitlement to 'judgment as a matter of law,' Civ.R. 56(C), at the earliest practicable time." 74 Ohio St.3d at 433-434, 659 N.E.2d 1232.

{¶145} As in this case, in *Gallagher* the Browns' key defense was not raised during the trial of the case. The court explained the effects of that on an opposing party and on the court and jury:

{¶146} "We require the defendant to put forth alleged defenses, and arguments to support them, in order to define the issues in a case to put both the plaintiff and the trial court on notice of the particular defense to be at issue so that the litigation may be formulated and shaped. When the defendant interposes an avoidance or affirmative defense which appears to have merit, the defense frequently becomes an issue upon which the case may turn. Generally, the plaintiff must vigorously oppose the defense at the earliest opportunity. The idea that a defendant waives a defense he or she fails to raise is especially applicable when the defendant supposedly has available a defense that, if established, is of such extraordinary strength that it can prevent the plaintiff from making a prima facie negligence case. If a plaintiff is not put on notice of such a defense, he or she of course should not be expected to anticipate it, as the plaintiff cannot counter a defense that has never been introduced as an issue. Likewise, a trial judge is not required to anticipate the existence of a defense that is not raised. To require a trial court to grant a defendant judgment as a matter of law on an issue never timely raised would fly in the face of fundamental rules of our adversarial system of trial, which place specific responsibilities on parties involved in litigation to shape the course of the trial." *Gallagher*, 74 Ohio St.3d at 436, 659 N.E.2d 1232.

{¶147} Had AICI raised its defense in a timely manner, Dardinger could have introduced evidence opposing it. The trial court, in addition to finding waiver, also found that Anthem was "so dominated and controlled [by AICI] that it is no more than a paper existence." Dardinger could have sought to pierce the corporate veil in the prosecution of his case had the issue been in play.

{¶148} Parties must decide their issues, incorporate them into their strategy, and be responsible for the results: " 'Parties, through their counsel, are responsible for shaping the trial through the issues they select for resolution; a trial court [and opposing counsel] cannot reasonably be expected to anticipate the existence of an argument that is not raised, nor may we allow an opposing party to bear the loss caused by poor litigation of the trial by counsel

21

for the party responsible.' " (Citations omitted.) *Turner v. Cent. Local School Dist.* (1999), 85 Ohio St.3d 95, 99, 706 N.E.2d 1261 (plurality opinion), quoting *Hill v. Urbana* (1997), 79 Ohio St.3d 130, 141, 679 N.E.2d 1109 (Moyer, C.J., dissenting).

{¶149} Here, AICI did not put forth its defense, or its arguments to support it, in a timely manner. AICI did not clearly and effectively raise its defense in its motions for directed verdict. AICI played a large role in shaping the trial, and instead of asserting its defense early on, it decided to stand with Anthem and fight Dardinger's claims on other grounds. In the end, that strategy failed. AICI contends that the trial court erred in ignoring its separate identity. Even if it were error, AICI invited it.

{¶150} Accordingly, we reverse the judgment of the court of appeals on the issue of AICI's liability and reinstate the jury verdicts against AICI.

Punitive Damages

{¶151} Appellant requests that we review the issues mooted by the appellate court's judgment. The bulk of those remaining issues involve the appropriateness of the jury's punitive damages award. We will address the issue of whether that award was "grossly excessive" and thus violated the federal Due Process Clause, whether it was excessive under Ohio law, and whether remittitur is appropriate.

Constitutionality

{¶152} The determination of whether a punitive damages award violates the federal Constitution is rooted in the Due Process Clause. In *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, the court held that elementary notions of fairness "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." 517 U.S. at 574, 116 S.Ct. 1589, 134 L.Ed.2d 809. In *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 715 N.E.2d 546, this court applied the three guideposts established in *BMW* that indicate whether a defendant has received adequate notice of the possible sanction:

{¶153} "The guideposts set forth in *BMW* include the degree of reprehensibility of the defendant's conduct, the disparity between the harm suffered by the plaintiff and the amount of the punitive damages award, and the difference between the punitive damages award and civil or criminal penalties authorized or imposed in similar cases." *Wightman*, 86 Ohio St.3d at 439-440, 715 N.E.2d 546.

{¶154} A lack of fair notice may render a sanction "grossly excessive" and thus unconstitutional. *BMW*, 517 U.S. at 574-575, 116 S.Ct. 1589, 134 L.Ed.2d 809. We thus

apply the *BMW* factors to this case. The first factor is the reprehensibility of the defendant's conduct, a factor that *BMW* calls "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." 517 U.S. at 575, 116 S.Ct. 1589, 134 L.Ed.2d 809. It is here that the appellees fare most poorly. In *BMW*, the conduct under review was BMW's repainting of scratched new cars without notifying buyers. Here, as in *Wightman* (a railroad-crossing case involving the death of a teenaged driver and her passenger), we are dealing with human lives, rather than automobiles. But in *Wightman*, the tragedy at the heart of the case unfolded in mere seconds. Here, the tragedy evolved over months, while Anthem and AICI watched. They created hope, then snatched it away. They took a dignified death from Esther Dardinger and filled her last days with frustration, doubt, and desperation. And every minute of additional pain suffered by Esther Dardinger was a natural outgrowth of the defendants' practiced powerlessness, their active inactivity.

{¶155} Anthem's and AICI's procedures seemed to work best before the full power of their bureaucracy could be brought down upon the Dardingers. Anthem's Columbus Area Medical Director, Dr. Borg, allowed Esther's first IAC treatment. Based on that decision, other Anthem personnel approved the next two. The results were encouraging: an MRI revealed shrinking of the tumors, and Esther tolerated the procedures well. She was able to continue living a fairly normal life.

{¶156} And then came the bureaucracy. Anthem sought an opinion from its consultant-oncologist, Dr. Pancoast. Dr. Pancoast is not a neuro-oncologist. Despite allowing IAC treatments for other patients, Dr. Pancoast decided that IAC was still experimental as to Esther's particular type of brain tumor. Anthem was not interested in knowing whether the treatments were actually working for Esther.

{¶157} The reasons for the denial changed. Originally, Anthem told OSU that the denial was because of the experimental nature of the procedure. In its followup letter after its telephone denial, Anthem cited the inpatient nature of the treatments as the reason for denying benefits, further muddying the situation.

{¶158} People were fighting for Esther, but they were no match for Anthem's intransigence. Tammy Kornja tried to find out how to help. She was told to tell Dr. Newton to call Anthem. Anthem did not call Dr. Newton itself. There is no evidence to show that a mere phone call would have made a difference as to Anthem's Byzantine appeals process. Its paperwork requirements came to light later.

{¶159} Bob Dardinger called Anthem in early July to let it know how desperate the

situation was. He was told to calm down and wait out the appeals process. He was not told that the process might take 120 days. Anthem knew that its appeal clock does not start to run until the appeal is officially submitted. No one told Bob that.

{¶160} Tammy Kornja called again in the middle of July. She was told that Anthem would look into where the appeal stood. No one called her back. When she called back herself in late July, she was told that payment for Esther's treatment had been approved. Hope returned, only to be snatched away again when Anthem called Tammy and told her there had been a mistake.

{¶161} Meanwhile, the appeal reached Anthem. It was sent on August 5, received on August 11, but not dealt with until August 28. Anthem argues that the file mentioned nothing about urgency—somehow Anthem was unable to determine within its bureaucracy that authorizing payment for treatment of brain tumors is an urgent matter. In addition, Anthem representatives had been hearing since early July how dire Esther's circumstances were.

{¶162} On August 28, Anthem's 17-day delay was extended further. Maggie Neely did as she was told and closed the appeal. She did not call the contact person on the appeal. She did not write to the contact person on the appeal. She did not call the Anthem representative on site at OSU. Instead, she sent a letter to a nameless, faceless department somewhere in the midst of another bureaucracy. Anthem would not bother to tell its insured what was happening either. Nor did it bother to tell the provider bringing the appeal.

{¶163} Because of what was occurring at Anthem, Esther went with a different kind of chemotherapy, which sucked her remaining good days from her. Anthem says she that should have gone ahead with the IAC treatments, citing evidence that OSU would not have made her pay. Esther wanted Anthem to pay. She did not want to jeopardize her family's financial well-being.

{¶164} When OSU finally learned, after doing its own investigating, that the appeal had been in limbo for nearly a month, after already languishing within Anthem for over two weeks, it rushed what Anthem considered necessary medical records to Anthem in Canton. Canton then sent them to Cincinnati. A Cincinnati employee offered to take them to Indianapolis. She was thwarted.

{¶165} Throughout October, the AICI bureaucracy sat on the appeal. It added its own level of delay, not from any fault of the Dardingers and OSU, but from its own internal policies. While the appeal lingered in the limbo of Indianapolis, Anthem planned to withhold information from anyone who asked for it. E-mails from within the organization demonstrate

that individuals knew that Anthem red tape had caused a "sad and embarrassing situation." Still, the situation could not get resolved. Finally, the appeal made its way to the reviewing doctor. The all-important review file was missing most of what OSU had included in it. What was included was Anthem's reasons why the appeal should be denied.

{¶166} For all of Anthem's obsession with process, the actual review of Esther's file took less than 30 minutes. The final letter outlining the reasons for the rejected appeal claimed that Anthem's "Appeals Committee" had reviewed the appeal. They tried to hide the fact from Bob Dardinger that one person ultimately made the decision, and he spent less than a half-hour deciding it.

{¶167} Meanwhile, fed up, scared, and desperate, the Dardingers decided to go forward with the IAC treatments despite their costs. Anthem had worn them down as surely as the cancer had. Like the cancer, Anthem relentlessly followed its own course, uncaring, oblivious to what it destroyed, seeking only to have its way. The ruination of a life was just a side effect.

{¶168} We agree with the trial court that "the jury could easily find that a pervasive corporate attitude existed with the defendants to place profit over patients" and that "the defendants disregarded the rights of their insured[s] in an effort to obtain higher profits."

{¶169} In *BMW*, the court stated that "BMW's conduct evinced no indifference to or reckless disregard for the health and safety of others." 517 U.S. at 576, 116 S.Ct. 1589, 134 L.Ed.2d 809. The exact opposite could be said of Anthem and AICI in this case. Accordingly, we find that the conduct of the appellees reaches the level of reprehensibility sufficient to warrant the substantial punitive damages award the jury imposed in this case.

{¶170} The Supreme Court's "second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *BMW*, 517 U.S. at 580, 116 S.Ct. 1589, 134 L.Ed.2d 809. As we said of the Supreme Court and our own court in *Wightman*, "the court, like this court, has consistently rejected the notion of a bright-line mathematical formula for the computation of the reasonableness of punitive damages awards." *Wightman*, 86 Ohio St.3d at 441, 715 N.E.2d 546.

{¶171} The punitive damages award here was nearly twenty times the amount of the compensatory damages awarded. In *BMW*, the court referred to the 500-to-1 ratio awarded by the jury in that case as "breathtaking." 517 U.S. at 583, 116 S.Ct. 1589, 134 L.Ed.2d 809. The court saw that case as an exception: "In most cases, the ratio will be within a

constitutionally acceptable range, and remittitur will not be justified on this basis." *Id*.

{¶172} In *Wightman*, we allowed a 6,250-to-1 damages ratio to stand. We found the ratio factor to have less relevance in that case due to the egregiousness of the act and the uncommonly low economic damages involved. 86 Ohio St.3d at 438, 441, 715 N.E.2d 546. We look at the damages awarded in this case, too, as a whole. The $2.5 million awarded to Dardinger on the bad-faith claim was not unusual considering the five months that Esther Dardinger had to endure. The restraint the jury showed on the compensatory damages and the lack of a "breathtaking" ratio between those damages and punitive damages cause us to hold that the second of the *BMW* indicia does not favor the decision that this jury's award exceeded constitutional bounds.

{¶173} The third indicium of excessiveness involves "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." 517 U.S. at 583, 116 S.Ct. 1589, 134 L.Ed.2d 809. While there is no statute directly on point as to the defendants' behavior in this case, an insurer that commits one of the unfair and deceptive practices outlined in R.C. 3901.21 is subject to fines of $3,500 per occurrence and can lose its license to engage in the business of insurance in Ohio, pursuant to R.C. 3901.22(F) and 3901.22(D)(1). The loss of Anthem's license to engage in the business of insurance in Ohio would certainly be a catastrophic punishment far outstripping the award in this case.

{¶174} Moreover, the purpose of the *BMW* test is to give fair notice of the conduct that will subject a defendant to punishment as well as the severity of the punishment that a state may impose. 517 U.S. at 574, 116 S.Ct. 1589, 134 L.Ed.2d 809. As this court said in *Wightman*, the most relevant civil penalty in cases like these is the potential civil damage award in a lawsuit. 86 Ohio St.3d at 441, 715 N.E.2d 546. Ohio law has clearly established that insurers can be liable in compensatory and punitive damages if they act in bad faith. See *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 557, 644 N.E.2d 397 (plurality opinion). This court has reinstated a jury verdict of over $13 million in compensatory damages alone in a bad-faith insurance case. See *Leber v. Smith* (1994), 70 Ohio St.3d 548, 639 N.E.2d 1159. The *Wightman* case included a punitive damages award of $15 million. Large punitive damage awards occur in other jurisdictions as well. The Utah Supreme Court recently reinstated a $145 million punitive damages award in a bad-faith case. *Campbell v. State Farm Mut. Auto. Ins. Co.* (2001), 432 Utah Adv.Rep. 44, 2001 UT 89, ___ P.2d ___, 2001 WL 1246676, certiorari granted (2002), ___ U.S. ___, 122 S.Ct. 2326, 153 L.Ed.2d

158.

{¶175} We believe that Anthem and AICI had sufficient notice that they were facing the potential of large punitive damages awards if they were found guilty of bad faith. Thus, the third *BMW* factor does not indicate an unconstitutional award in this case.

{¶176} Therefore, in considering the three guideposts set forth by the court in *BMW*, we find that Anthem and AICI had fair notice of the conduct that would subject them to punishment as well as the severity of the possible punishment. The award in this case was not grossly excessive under the federal Constitution and did not violate the appellees' due process rights.

Excessiveness Under Ohio Law

{¶177} While not grossly excessive under the federal Constitution, we find that the punitive damages award in this case was excessive under Ohio law.

{¶178} "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 651, 635 N.E.2d 331. We held in *Wightman* that "a punitive damages award is more about defendant's behavior than the plaintiff's loss." 86 Ohio St.3d at 439, 715 N.E.2d 546. The focus of the award should be the defendant, and the consideration should be what it will take to bring about the twin aims of punishment and deterrence as to that defendant. We do not require, or invite, financial ruination of a defendant that is liable for punitive damages. While certainly a higher award will always yield a greater punishment and a greater deterrent, the punitive damages award should not go beyond what is necessary to achieve its goals. The law requires an effective punishment, not a draconian one.

{¶179} We upheld the trial court's granting of a remittitur in *Wightman*. The trial court in that case reduced the jury's award by 40 percent, from $25 million to $15 million. This court held that the award would " 'sufficiently punish Conrail and create a positive inducement to change its practices.' " Id., 86 Ohio St.3d at 445, 715 N.E.2d 546, quoting the trial court. We look in this case for an award that will sufficiently punish Anthem and AICI and be a spur for them to change their practices.

{¶180} The jury had before it evidence of AICI's net profit in 1998 of approximately $172 million dollars. The jury's award was between one-fourth and one-third of that figure. While that fraction of a defendants' annual profit will not always be excessive, we find that as to these particular defendants in this particular case it is. The figure it yields is extremely high. The largest punitive damages award to come before this court for review in at least the

last decade is the $15 million award in *Wightman*. That case involved a very large company, Consolidated Rail Corporation, which did not argue that the award was disproportionate to its income or net worth.

{¶181} We do believe that appellees' actions in this case merit a historic punitive damages award. Their industry's central role in the lives of so many Ohioans requires that. The award must be sufficient to persuade Anthem to pay more attention to patient care; to install a system in which appeals are answered, and not purposely delayed; to achieve a system where appeals move forward on their own merit, and are not dropped because Anthem has outlasted the patient in the waiting game. The award must respect the fact that Anthem's bad acts were perpetrated on people who were in their most desperate state. And the award must reflect that, unlike in *Wightman*, the central event in this case was not accidental.

{¶182} Can an appropriate punitive damages award cure Anthem any more than doctors can cure cancer? The bureaucracy will always be in place, but, like chemotherapy to cancer, an effective award can tame it, keep it from spreading, and minimize its harmful effects. But also like chemotherapy, an award must be at a level where it does not create its own overriding problems.

{¶183} Taking that all into account, we hold that a punitive damages award doubling the award in *Wightman* would have been appropriate in this case. The $49 million jury award here was over three times the award in *Wightman*. We therefore find that the punitive damages award was excessive under Ohio law, and that the trial court's failure to so find was so unreasonable as to constitute an abuse of discretion. *Poske v. Mergl* (1959), 169 Ohio St. 70, 75, 8 O.O.2d 36, 157 N.E.2d 344, citing *Steiner v. Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855, and *Klever v. Reid Bros. Express, Inc.* (1951), 154 Ohio St. 491, 43 O.O. 429, 96 N.E.2d 781. A $30 million award is appropriate as to the profits of the corporations involved and appropriate in the scheme of past punitive damages awards in Ohio.

Remittitur

{¶184} The power to order a remittitur is not limited to trial courts. *Shaffer v. Maier* (1994), 68 Ohio St.3d 416, 627 N.E.2d 986; *Moskovitz*, 69 Ohio St.3d 638, 635 N.E.2d 331. The court in *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph three of the syllabus, set forth the four criteria necessary for a court to order a remittitur: (1) unliquidated damages are assessed by a jury, (2) the verdict is not influenced by passion or

prejudice, (3) the award is excessive, and (4) the plaintiff agrees to the reduction in damages.

{¶185} Here, we have a damages award assessed by the jury that this court has deemed excessive. The question remains whether the jury was influenced by passion and prejudice. The trial judge, who sits in the best position to judge a jury's motivations, did not find that the jury's decision was the result of passion and prejudice. It appears that the jury rather scientifically decided to take between one-third and one-fourth of the annual net income of Anthem. We do not find that award to be shockingly wrong. We simply believe that a figure that equals one-sixth of annual net earnings, that is more in line with the history of punitive damages awards in Ohio, to be more appropriate. We agree with the trial court that the award was free from passion and prejudice.

{¶186} The fourth factor, the acceptance of the plaintiff, is, of course, up to Dardinger. We are imposing a remittitur of $19 million, so that the total punitive damages award is $30 million. We also have another condition.

{¶187} As was stated above, a punitive damages award is about the defendant's actions. "The purpose of punitive damages is not to compensate a plaintiff but to punish the guilty, deter future misconduct, and to demonstrate society's disapproval." *Davis v. Wal-Mart Stores, Inc.* (2001), 93 Ohio St.3d 488, 493, 756 N.E.2d 657 (F.E. Sweeney, J., concurring in part and dissenting in part). At the punitive-damages level, it is the societal element that is most important. The plaintiff remains a party, but the de facto party is our society, and the jury is determining whether and to what extent we as a society should punish the defendant.

{¶188} There is a philosophical void between the reasons we award punitive damages and how the damages are distributed. The community makes the statement, while the plaintiff reaps the monetary award. Numerous states have formalized through legislation a mechanical means to divide a punitive damages award between the plaintiff and the state. In some states, the state's portion goes to a special fund, in others, to the general fund. Annotation (1993), 16 A.L.R. 5th 129. In Ohio, punitive damages are an outgrowth of the common law. *Roberts v. Mason* (1859), 10 Ohio St. 277, 1859 WL 78; *Saberton v. Greenwald* (1946), 146 Ohio St. 414, 32 O.O. 454, 66 N.E.2d 224; *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. Therefore, Ohio's courts have a central role to play in the distribution of punitive damages. Punitive damages awards should not be subject to bright-line division but instead should be considered on a case-by-case basis, with those awards making the most significant societal statements being the most likely candidates for

alternative distribution.

{¶189} Clearly, we do not want to dissuade plaintiffs from moving forward with important societal undertakings. The distribution of the jury's award must recognize the effort the plaintiff undertook in bringing about the award and the important role a plaintiff plays in bringing about necessary changes that society agrees need be made. Plaintiffs themselves might get involved in how the award is distributed. Indeed, in *Wightman*, the administrator of the estate apparently undertook, on her own initiative, to address the societal interest in the award by assigning no less than one-half of any punitive damages award to the Michelle Wightman Charitable Foundation. See 86 Ohio St.3d at 433, 715 N.E.2d 546.

{¶190} In this case, should Dardinger accept this court's remittitur, the jury's punitive damages award would be reduced to $30 million. To that $30 million would be added statutory postjudgment interest. See R.C. 1343.03(A). From that corpus, $10 million should go to Dardinger. From the remainder should be drawn an amount for the payment of litigation fees, including attorney fees. The amount of attorney fees should be determined by the contract between Dardinger and his attorney, and should be based upon the amount originally in the corpus, $30 million plus statutory interest. The final net amount remaining after the prescribed payments should go to a place that will achieve a societal good, a good that can rationally offset the harm done by the defendants in this case. Due to the societal stake in the punitive damages award, we find it most appropriate that it go to a state institution. In this case we order that the corpus of the punitive damages award go to a cancer research fund, to be called the Esther Dardinger Fund, at the James Cancer Hospital and Solove Research Institute at the Ohio State University.

Evidentiary Issue

{¶191} The court of appeals found that the trial court had erred in allowing into evidence the personal salaries of Anthem and AICI executives. The court found that "this evidence was not specifically material to the merits of this action."

{¶192} Plaintiff argues that the introduction of executive salaries was necessary to demonstrate that a financial incentive system was in place to encourage decisions to deny treatment. Also, in dealing with the punitive damages award, the jury had to look at what it might take to send a message to Anthem and AICI. We find the executive salaries to be marginally relevant in that regard.

{¶193} In making evidentiary close calls such as this one, the trial court is in the best place to make a decision. "The trial court has broad discretion in the admission and

exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere." *State v. Hymore* (1967) 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126.

{¶194} We reverse the judgment of the court of appeals on this issue.

## Conclusion

{¶195} Accordingly, we reverse the judgment of the court of appeals, reinstate the jury's verdicts, subject the punitive damages award to a remittitur of $19 million as well as other conditions, and reverse the judgment of the court of appeals on the remaining evidentiary issue.

Judgment accordingly.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

DOUGLAS, J., concurs separately.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in part and dissent in part.

COOK, J., concurs in part and dissents in part.

_____

**DOUGLAS, J., concurring.**

{¶196} I respectfully concur with the majority in order to achieve a final result in this matter. My own personal opinion, however, is that the court of appeals' judgment should be reversed and the judgment of the trial court reinstated. As I read some of the other writings herein, I believe they express much the same opinion but reach a somewhat different result. So that there will be no question of today's announcement being a majority decision, I concur.

_____

**MOYER, C.J., concurring in part and dissenting in part.**

{¶197} Although I do not subscribe to all of the rhetoric in the majority opinion, I concur with the majority's holding to the extent that it reverses the judgment of the court of appeals on the evidentiary issue and reinstates the jury verdict against Anthem Insurance Cos., Inc. ("AICI"). Nevertheless, I dissent from the majority on the issue of punitive damages for two reasons: the majority (1) orders an unprecedented alternative distribution of punitive damages and (2) fails to remand the cause to the court of appeals on the issue of remittitur. I address each reason separately.

### I. Alternative Distribution

{¶198} I dissent from the majority's partial distribution of the punitive damages

award to a charitable organization. In the context of this case, there is no more appropriate recipient of a partial distribution of punitive damages than the James Cancer Hospital. I am therefore sympathetic to the motives of the majority, but I believe that such a practice, established by this court and absent statutory authorization, is fraught with unintended and undesirable consequences.

{¶199} My research reveals that every American court that engages in the alternative distribution of punitive damages awards has acted pursuant to statutory authorization. This form of judicial restraint is born of good reason. For the majority's holding today, rendered without precise standards or guidelines, sanctions a judge's unbridled discretion to allocate punitive damages to his or her preferred charity, and leaves open the question of how courts should determine the percentage of punitive damages subject to such distribution.

{¶200} Further, I disagree with the majority's conclusion that Ohio courts should play a "central role" in the distribution of punitive damages insofar as I do not consider the General Assembly to be precluded from modifying the common law of punitive damages by the enactment of legislation. As the majority concedes, "[n]umerous states have formalized through legislation a mechanical means to divide a punitive damages award between the plaintiff and the state." These states have recognized that the legislative branch is better equipped to establish a uniform mechanism for alternative distribution, thereby controlling judicial discretion and—in states authorizing the distribution of punitive damages to a general state fund—eliminating any inequity among potential recipients. In view of the majority's holding, Ohio may benefit from such legislation.

{¶201} Finally, this court (and almost every member of the majority) has historically held that it is inappropriate for a court to decide an issue not suggested by the parties on appeal without giving notice of its intention and an opportunity to brief the issue. See *State v. Peagler* (1996), 76 Ohio St.3d 496, 499, 668 N.E.2d 489, fn. 2 ("This court has often held that if a reviewing court chooses to consider an issue not suggested by the parties on appeal * * *, the court of appeals should give the parties notice of its intention and an opportunity to brief the issue"); *State v. Casalicchio* (1991), 58 Ohio St.3d 178, 184, 569 N.E.2d 916 (Resnick, J., concurring in part and dissenting in part) ("It is inappropriate for this court to decide the merits of this case * * * since neither party had the opportunity to brief this issue"); *Ratchford v. Proprietors' Ins. Co.* (1989), 47 Ohio St.3d 1, 4, 546 N.E.2d 1299 ("It is unfair on appeal, and inappropriate, to decide a case on an issue that a party, losing by the decision, has not had an opportunity to refute by introducing evidence or argument.");

*Toledo's Great E. Shoppers City, Inc. v. Adbe's Black Angus Steak House No. III, Inc.* (1986), 24 Ohio St.3d 198, 202, 24 OBR 426, 494 N.E.2d 1101 ("It is also true that this court has cautioned that '[i]n fairness to the parties, a Court of Appeals which contemplates a decision upon an issue not briefed should * * * give the parties notice of its intention and an opportunity to brief the issue' "); *C. Miller Chevrolet, Inc. v. Willoughby Hills* (1974), 38 Ohio St.2d 298, 301, 67 O.O.2d 358, 313 N.E.2d 400, fn. 3 (same).

{¶202} Despite this well-settled principle of Ohio law, the plaintiff in this case will have no opportunity to challenge the alternative distribution of punitive damages in any Ohio court. The gravity of this point is further exacerbated by the fact that litigants in other states have successfully challenged the alternative distribution of punitive damages. See, e.g., *Kirk v. Denver Publishing Co.* (Colo.1991), 818 P.2d 262; *McBride v. Gen. Motors Corp.* (M.D.Ga.1990), 737 F.Supp. 1563. I strongly object to the extinguishment of a right that has been so consistently protected under Ohio jurisprudence.

{¶203} The doctrine of remittitur has historically been used to correct excessiveness in the *amount* of jury awards, *Pendleton St. RR. Co. v. Rahmann* (1872), 22 Ohio St. 446, 448, 1872 WL 25, and not as a mechanism to correct perceived deficiencies in the law of punitive damages. I would not expand the doctrine of remittitur beyond this time-honored principle.

## II. Remand

{¶204} Because a majority of the court of appeals concluded that the issue of punitive damages was moot, it did not review the trial court's determination that the punitive damages award was not excessive. In view of this procedural posture, I would make no determination as to whether the award is or is not excessive and would remand the cause to the court of appeals to determine whether the trial court abused its discretion when it denied the motion for remittitur.

{¶205} For the foregoing reasons, I concur in part and dissent in part.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

_____

**COOK, J., concurring in part and dissenting in part.**

{¶206} Like the Chief Justice, I agree with the majority that appellees invited the error here, if any, concerning their treatment as a single entity. I also agree with the Chief Justice that, in light of our requisite reversal, the majority errs in refusing to remand this cause to the court of appeals for consideration of those issues that court held moot.

Therefore, I dissent from the majority's atypical distribution of the punitive-damages award.

_____

Palmer Volkema & Thomas, L.P.A.; Robert G. Palmer, Michael S. Miller, Tony C. Merry and Elizabeth S. Burkett, for appellant.

Thompson Hine, L.L.P., Earle Jay Maiman and Renee S. Filiatraut, for appellees.

Bricker & Eckler, L.L.P., Kurtis A Tunnell and Anne Marie Sferra, urging affirmance for amicus curiae Ohio Alliance for Civil Justice.

Vorys, Sater, Seymour & Pease, L.L.P.; Michael J. Canter and Lisa Pierce Reisz, urging affirmance for amici curiae Ohio Chamber of Commerce and Ohio Council of Retail Merchants.

_____